SECOND DIVISION

NOVEMBER 6, 2001 

No. 1-99-2568

In re April C., Amy C., and Anna C., Minors and Respondents-Appellees

-------------------------------------

(The People of the State of Illinois,

Petitioner-Appellee
,

v.

Kathleen C.,

Respondent-Appellant).

))))))))))

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Sharon Coleman & Paul P. Biebel,

Judges Presiding.

JUSTICE McBRIDE delivered the opinion of the court:

The State filed petitions to adjudicate minors April C., Amy C., and Anna C. wards of the court.  The circuit court found the minors were abused pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/1-1 
et
 
seq.
 (West 1998)) due to physical abuse and excessive corporal punishment by their father, Ernie C., and due to a substantial risk of physical injury.  A dispositional hearing was held and parents respondent Kathleen C. and Ernie C. were found to be unwilling, unable, and unfit to parent the minors, who were then adjudicated wards of the court.  Respondent now appeals both the adjudication of abuse and adjudication of wardship.
(footnote: 1)
 On June 13, 1997, the State filed petitions for the adjudication of wardship regarding respondents 11-year-old April C., 8-year-old Amy C., and 6-year-old Anna C. (collectively, the children or the minors), who had all been taken into custody two days earlier.  The petitions alleged that Anna and Amy had been subjected to physical abuse and excessive corporal punishment and were at substantial risk of physical injury.  The petition for April alleged that she was at substantial risk of physical injury.  A case management conference order dated August 27, 1997, indicates that the parties were granted leave to amend the petition regarding April to add allegations of physical abuse and excessive corporal punishment.

On October 1, 1997, an adjudication hearing was held before Judge Sharon Coleman.  At the hearing, the evidence consisted of a stipulation entered into by the parties.  Respondent and Ernie C. were represented by different counsel.  According to the stipulation:

1. Respondent and Ernie C. were the natural parents of April, Amy, and Anna;

2. Respondent and Ernie C. were custodial at all relevant times;

3. Since September 1996, respondent and Ernie C. had also had custody of Ernie C.'s stepdaughter's children Jacoba, Angelica, and Guandensio
(footnote: 2);

4. While in the custody of respondent and Ernie C., Jacoba sustained a fractured transverse left femur;

5. Ernie C. admitted to forcefully holding Jacoba down on the toilet seat in an effort to potty train;

6. Respondent and Ernie C. stated to doctors and nurses at Children's Memorial Hospital that an explanation for the injury could have been that Jacoba fell down a flight of stairs or fell off a toy;

7.  If called to testify, Dr. Marianne Radkowski of Children's Memorial Hospital would state that the injury to Jacoba could have occurred during toilet-training if Ernie C. placed his hands on the child's thigh and used an extreme amount of force to push the child on the toilet seat.  Dr. Radkowski would further testify that the type of fracture sustained by the child would not occur from falling down the stairs or falling off a toy.  Dr. Radkowski would also state that a bone scan was completed and that this was an instance of abuse;

8. A bone scan completed at Children's Memorial Hospital revealed that Jacoba also had healed fractures to his right radius and ulna;

9. Based on Jacoba's healed fractures, fractured left femur, and lack of a plausible explanation by respondent and Ernie C., the multidisciplinary team at Children's Memorial Hospital ruled that the findings were consistent with physical abuse;

10. If called to testify, Susan Garner, a social worker at the minors' school, would state that (a) there had been a couple of incidents regarding Ernie C. that had caused her concern; (b) in or about May of 1997, Guandensio came to school with a bloody lip; (c) respondent told her Guandensio had bitten his lip when Ernie C. forcefully kept the minor on the toilet; and (d) on or about May 21, 1997, Ernie C. was picking Anna up at school when he was observed grabbing her by the neck;

11. If called to testify, Nicholas Conway would state that while speaking with respondent on June 9, 1997, she told him that Ernie C. had a temper, that she was aware of the neck incident with Anna; and that she had observed Ernie C. holding Guandensio down on the toilet seat, and that it was excessive and was how Guandensio had bitten his lip;

12. April and Amy had made statements that they got whippings from Ernie C. with a belt, board, or a hand when they were in trouble; and

13. The medical records from Mount Sinai for April, Anna, Amy, Guandensio, Angelica, and from Children's Memorial Hospital for Jacoba were entered into evidence.

The parties also stipulated to a finding that April, Amy, and Anna had been physically abused by Ernie C., had been subjected to excessive corporal punishment, and were at substantial risk of injury.

Based on the stipulated evidence, the court found that April, Amy, and Anna were abused in that they had been physically abused by Ernie C., subjected to excessive corporal punishment by Ernie C., and were at substantial risk of physical injury.

A dispositional hearing commenced before Judge Paul Biebel on March 18, 1999.  At the time of the hearing, April was 13, Amy was 10, and Anna was 8 years old.  At the dispositional hearing, the following evidence was adduced.

Julie Dvorsky, a licensed clinical social worker with a master's degree in social work, testified that she was employed by Hephzibah Children's Association and had been assigned to work with the C. family since August 21, 1997.  The case first came into the system when Ernie C.'s grandchild Jacoba was found with a bone fracture.  Several older healed fractures were discovered on Jacoba as well.  During a home visit in August 1997, Ernie C. explained to Dvorsky that he was trying to keep Jacoba on a toilet-training seat and heard a crack while pushing down on him.

The Department of Children and Family Services (DCFS)
 referred the family to receive psychological examinations and a bonding assessment in September 1997.  Following the psychological assessment, it was recommended that respondent get individual psychotherapy and couples or marital counseling, continue working toward her GED, and join a women's support group.  The assessment noted that respondent was capable of good parenting but was not capable at the present time of modifying her husband's behavior.  It was recommended that Ernie C. get individual psychotherapy, vocational training, a bonding assessment, and a neurological evaluation to rule out narcolepsy.

The September 1997 bonding assessment recommended that the children not return home due to the psychological issues affecting each parent.  The assessment noted an apparent lack of emotional "connectedness" between respondent, Ernie C., and the children.  The assessment contained statements made by all three children to the effect that they missed their parents and wanted to return home and noted that the children were respectful of their parents and well-behaved.  The assessment described respondent and Ernie C.'s relationship with each other as being of particular concern due to suspected past physical abuse of respondent by Ernie C. and noted that respondent "seemed incapable at the present time [of] modifying her husband's behavior."  The assessment did describe respondent, however, as being able to acquire additional parenting skills that may help her in the future to better parent her children.  Dvorsky testified that respondent had been cooperative with the services, including the bonding assessment.

Through DCFS, both parents were referred to Mary and Tom Leo and Associates for individual counseling.  The issues addressed in therapy included anger management and corporal punishment.  Initial reports from the therapist were promising, especially regarding respondent.  Dvorsky acknowledged that a January 6, 1998, report by a counselor at Mary and Tom Leo and Associates stated that respondent's bond with her daughters should be further evaluated and visited and that respondent appeared to be the more capable parent and the parent that would need to protect the children.  That same report indicated that although respondent's descriptions of her children contained "little sense of delight, warmth, or pain at their removal," she may actually care for the children deeply.  Dvorsky acknowledged that up until June 1998, the reports from Mary and Tom Leo and Associates expressed hope that respondent and Ernie C. would make significant progress in therapy.  Dvorsky testified that the hoped-for progress had not occurred.  A June 1998 report from Mary and Tom Leo and Associates stated that many of the sessions with respondent and Ernie C. had been struggles and that both respondent and Ernie C. seemed to believe that with the exception of Leroy Yates, a counselor the parents had sought out on their own, all of the professionals involved in the case were part of a conspiracy to prevent reunification with the children.  At the time of the hearing, respondent and Ernie C. were still participating in individual psychotherapy sessions on a monthly basis.  The therapists felt the family needed to be involved in family therapy in order to make any further progress.

According to Dvorsky, family therapy was attempted twice.  It was first attempted in October 1997, but was discontinued after one month because the therapist felt no progress was being made and that the parents needed to focus on their own individual psychological issues in that they were coming into the family sessions angry and were not focusing on the goals established in therapy.  The therapist told Dvorsky the children were "frozen" during the sessions and unable to speak.  The therapist also stated that this was one of the "most concerning" families he had seen.

Family therapy was attempted again in June 1998.  The sessions, which included just the children and respondent, were again discontinued after a month because the therapist found respondent to be "inappropriate."  As an example, Dvorsky related that respondent had walked out of the session while Anna was relating information on a life issue to respondent.  When she reentered the session, the girls "completely shut down."  The children refused to bring forth issues to their mother out of fear she would tell Ernie C., and April threatened to run away rather than attend family therapy sessions.  According to Dvorsky, as of the date of the disposition hearing (March 1999), the children were not ready to attempt family therapy again.

Respondent and Ernie C. attended a parenting class in September 1997.  Ernie C. wore sunglasses and fell asleep during the sessions, but respondent participated more.  Dvorsky  acknowledged that a report from the parenting class stated that there was a noticeable difference between respondent and Ernie C.  The report stated that respondent could generally be described as focused, her parenting comments and role-playing exercises reflected a certain level of sensitivity and insightfulness, she demonstrated a good understanding of encouragement while able to differentiate between effective and noneffective parenting statements, and she was able to complete the final exam independently.  Both parents completed the class and further classes were recommended.  Respondent and Ernie C. took a child management class in 1998.  According to Dvorsky, that class went better.

Respondent and Ernie C. participated in a clinical evaluation on November 2, 1998.  Respondent did not acknowledge that physical abuse had occurred in the home.  The evaluating psychiatrist noted that respondent "did not acknowledge that there was a substantial likelihood that her husband could have been the perpetrator [of the injury to Jacoba] yet when [Ernie C.] was interviewed separately he readily admits that he was the perpetrator in this incident."  The psychiatrist found respondent's evasiveness and denial that Ernie C. could have been the perpetrator to be of concern and stated that although he did not question that respondent would be able to adequately protect the children as a single parent, she was deferential to Ernie C.'s thinking and that "issue in and of itself may place her in situations that she is unable to resolve on her own."  Although the evaluating psychiatrist found that respondent appeared to lack insight into the needs of her children, Dvorsky acknowledged that the psychiatrist had also noted that respondent appeared to exhibit a caring attitude about the welfare of her children.

The psychiatrist was concerned about Ernie C.'s ability to parent the children due to psychiatric issues affecting him.  The psychiatrist diagnosed Ernie C. as suffering from post-traumatic stress disorder, with a secondary diagnosis of childhood physical abuse and neglect and an anti-social personality disorder with schizotypal features, resulting in social anxiety and problems with interpersonal relationships.  The psychiatrist recommended Ernie C. be put on anxiety medication.

Respondent and Ernie C. had supervised visitation with the children from August 1997 through December 1998.  Initially, both parents, but particularly Ernie C., would be very hostile and negative during the visits.  Respondent and Ernie C. would interrogate the children about the foster home and tell the children that the agency was trying to adopt them out and was not working toward returning them home.  Respondent in particular would ask questions about the foster home in a sarcastic manner and make negative comments about the foster parents and other children in the home.  The children informed Dvorsky that respondent's questioning made them uncomfortable.  Although Dvorsky acknowledged that respondent acted more appropriately when Ernie C. was not present at visitation, Dvorsky did not believe respondent was utilizing any of the knowledge gained from parenting classes in her visits with the children.  In November 1997, a Hephzibah employee reported that Ernie C. made an aggressive move toward her and the police were called, resulting in a temporary suspension of visitation.

In December 1998, Hephzibah decided that it would have at least three workers present during each supervised visit because respondent and Ernie C. were attempting to whisper to the children so that supervisors could not hear and because the children's behavior before and after the visits was causing concern.  The children would be angry and break items in the foster home before and after the visits and Amy would wet the bed.  During visits, the children were very flat and did not show much emotion.  The children were much more talkative both before and after the visits.  During visits where only respondent and the children were present, the children appeared much more comfortable and the interactions more free in nature.  Dvorsky had observed some of the visits and had seen the children frightened, especially when Ernie C. had been hostile toward workers.  Dvorsky testified that the children's therapist recommended that the children not be returned home and believed the children would make more progress if visitation with the parents were limited further.

Anna, who was eight years old at the time of the hearing, had begun to act out sexually in the foster home in May 1998.  She had asked who was going to pat her vagina and who was going to pull the black stuff out of Amy's vagina, and she had masturbated in front of a younger child in the foster home and had attempted to get that child involved in the masturbation.  None of the other minors in the foster home had been acting out sexually.  Dvorsky acknowledged that there was no evidence that Ernie C. was the perpetrator of sexual abuse toward Anna.

Dvorsky testified that up until December 1998, the goal of the case was to return the children to the home.  In December 1998, the goal was changed to substitute care upon a determination that the home environment was not appropriate.

Dvorsky testified that, in her opinion, respondent and Ernie C. were not able and fit to parent their children.  She testified that she was concerned Ernie C. did not have his anger issues under control and that respondent did not have the ability to protect the children from him.  Dvorsky testified that despite the services respondent had received and successfully completed, she was still not a fit parent, had made little progress, and had not followed through in visitations with the children by applying any of the techniques she had learned.  When Ernie C. had been volatile and threatening during visitation, respondent had not attempted to intervene on behalf of the children.  She had continued to whisper to the children and interrogate them about the foster home in a nonnurturing manner.  Dvorsky said respondent was not emotionally responsive to the children when they became upset during visitation and was unable to identify the feelings the children presented during the visits.  In addition, respondent had not acknowledged the abuse suffered by the children via Ernie C.  Dvorsky testified that she did not believe the children trusted respondent or felt that she would protect them and keep them safe.  In Dvorsky's opinion, it would be in the best interests of the minors if DCFS were appointed with the right to place the children.  Dvorsky stated that the children were together in a nonrelative foster home where the foster parent was committed to permanency for the children.  Dvorsky recommended that permanency be established in order for the children to feel more safe and stable.

Dvorsky agreed that respondent could still acquire additional parenting skills that would benefit her in parenting the children.

Lysa Seghetti, a DCFS social worker, testified that she had been assigned to the case from the time it came into the system until shortly before the dispositional hearing.

Seghetti referred Ernie C. for domestic violence counseling in January 1999.  Ernie C. informed her that he wanted to confer with his attorney regarding the referral.  Seghetti had not heard back from Ernie C. regarding the referral at the time of the disposition hearing.  She was also aware of referrals for Ernie C. for a neuropsychological examination in December 1998 and for a psychiatric follow-up in February 1999.  Seghetti did not know if Ernie C. had followed through on those referrals.

Seghetti had contact with Ernie C.'s daughter Molly, whose three children were also in the care of respondent and Ernie C. when the case came into the system.  It was Molly's son Jacoba who had sustained a fracture while in the care of respondent and Ernie C.  In December 1998, Molly informed Seghetti that when she was a child, Ernie C. molested her.  Later, Ernie C. had intercourse with her.  The sexual abuse went on until Molly was an adolescent and left the home.  Seghetti found Molly to be credible.  Seghetti found the information to be of concern because April, the oldest of respondent and Ernie C.'s three children, had told Seghetti that she would run away if family therapy resumed and reported that she had had thoughts of running away since she was five years old.  Seghetti testified that when the case first came into the system, the children were sent to the Under the Rainbow Program at Mount Sinai for a five-day evaluation for physical abuse, sexual abuse, and neglect.  The children were diagnosed as having been physically abused by Ernie C.  Seghetti acknowledged that the evaluation found no evidence of sexual abuse.

Seghetti testified that at one court hearing, Ernie C. became aggressive with her and she had to summon a sheriff to intervene.  On two occasions, Ernie C. told her she was "evil" and "from the devil."  Respondent had also accused Seghetti of working with the devil and informed her that Jesus was going to get her.

Seghetti concurred with Dvorsky's recommendation that the State be appointed as guardian for the children.  She did not believe it was in the children's best interests to return home to their parents, as she had concerns regarding their safety and whether respondent could actually protect them from Ernie C.  Finally, she did not believe Ernie C. had received all of the services necessary to make the home environment safe with him present.  Seghetti testified that respondent could probably parent the children in the absence of Ernie C. but she had grave concerns regarding the relationship of respondent and Ernie C. and respondent's ability to sever that relationship.

Tracy Handalman, a DCFS social worker with a master's degree in education and child development, testified that she had been the caseworker for the case involving respondent and Ernie C.'s three grandchildren since August 1997, and had recently been assigned as the social worker to the instant case involving April, Amy, and Anna.  She testified that the foster parent of the grandchildren had told her that Ernie C. had been showing up outside the grandchildren's day care.  In one instance, Ernie C. approached the foster parent's car.  The foster parent reported that the children had suffered emotional problems after seeing Ernie C.

Handalman recommended that it would be in the best interest of the children in the instant case to be placed under the guardianship of DCFS.  She did not believe it would be in the children's best interests to be in an environment where Ernie C. was living.  Her opinion was based on her belief that Ernie C. was the person who broke Jacoba's leg, the allegations of physical abuse against April, Amy, and Anna, and the fear she had seen in both the children and grandchildren regarding Ernie C.

Molly Ann Ruiz-C., the 28-year-old daughter of Ernie C., testified over the objection of the attorneys for both parents.  Molly testified that when she was around three years old, Ernie C. began to touch her in inappropriate places.  He would fondle her, put his fingers in her vagina, and put his penis between her legs and move up and down.  This happened a number of times and Molly recalled one instance where it hurt a lot.  Molly testified that her mother (who was not respondent) knew what Ernie C. was doing to her but did nothing about it.  Ernie moved out when she was about six years old.  Ernie C. was physically abusive to her, her siblings, and her mother.  Ernie would come back for visits after he moved out and would touch her, but, according to Molly, she knew better by then and he would stop.

Molly left home at age 13 and subsequently had 9 children and serious problems with drugs.  She was 28 years old at the time of the dispositional hearing and had been drug free for two years.  While attempting to recover from her drug problems, she had asked Ernie C. and respondent to care for her three children Guandensio, Angelica, and Jacoba.  At the time, she thought Ernie C. may have changed due to his religious beliefs and she liked respondent.  Respondent was not Molly's mother, but she treated the kids like they were her own grandchildren.

The Reverend LeRoy Yates testified on behalf of respondent that he was a minister, professional counselor at the Westside Holistic Family Center, and had a master's degree in psychotherapy.  Ernie C. and respondent came to him in July 1997 for counseling help.  They were not referred to him by DCFS.  In counseling, he worked with respondent in helping her to understand the need to protect the children from Ernie in cases where things got out of control.  Yates believed that respondent would be willing to do whatever was necessary to protect the children and testified that she had become more forceful in taking charge of decision-making in the family.  He concluded that respondent had the skills to be a fit parent for the children.

At the request of Lysa Seghetti, Yates prepared progress reports from time to time.  She would also notify him when staffings in the case were to take place and he would attend.

Reverend Yates acknowledged that he had met the children only in passing.  According to Yates, Ernie C. believed that he accidently injured Jacoba during toilet-training and respondent was not sure what happened.

Reverend Yates believed that respondent was much better equipped to take care of the family following therapy, because she had learned to protect the children and to be more "hands-on."  He stated that respondent had acknowledged that Ernie C. had gotten physical with her in the past but he was not aware of any incidents of battery during the period he had been counseling the couple.  Yates testified that, in his opinion, a battered woman is someone who has been beaten black and blue or someone who may have fractures.  He was not aware that an Under the Rainbow report from June 1997 had described respondent as someone who appeared to be a battered wife who refused to leave her current situation.

Reverend Yates stated that respondent told him she could manage the family on her own and would leave Ernie C. if necessary.  Reverend Yates stated that he did not believe the children needed to be protected from Ernie C.

Yates had worked with Ernie C. on anger-management issues.  Yates acknowledged that Ernie C. had admitted sexually abusing Molly during her childhood but Yates did not pursue that admission in therapy because he was primarily focusing on the current family.  Reverend Yates did not mention the sexual abuse of Molly in any of his reports concerning his treatment of Ernie C. and respondent aside from noting that Ernie C.'s second marriage was "a disaster." Reverend Yates testified that the family was caring and normal and had high potential for reunification.  He acknowledged, however, that it was not normal for a family to have issues of domestic violence, incest, and a broken bone caused by a caretaker. 

On cross-examination, Reverend Yates acknowledged that he was not a licensed clinical social worker and was not State certified.

Dvorsky testified that in addition to counseling through DCFS referrals, respondent and Ernie C. began counseling with Reverend Leroy Yates of the Westside Holistic Family Center in July 1997.  Respondent and Ernie C. found Reverend Yates on their own and were not referred to him by DCFS.

Dvorsky testified that Hephzibah, upon examining psychological evaluations tendered by Yates, determined that he was not qualified to provide respondent and Ernie C. with the counseling services that they needed.  Dvorsky testified that Yates had participated in several staffings at Hephzibah and had tendered reports on the case.  Yates had noted in a September 1997 report submitted to Hephzibah that respondent and Ernie C. were cooperative, were learning how to communicate and listen, and were finding new ways to solve problems and live together peacefully.  The report concluded that if the family continued to cooperate with the counseling process, in time they may grow into an adjusted, functional family.  In a May 9, 1998, document prepared for Hephzibah by Yates, he indicated that respondent and Ernie C. were making progress in counseling and concluded that continuing to postpone reunification of the family would be unwise.

Seghetti testified that she had spoken with Leroy Yates approximately a dozen times over the past two years.  Seghetti believed that Yates minimized the allegations contained in the petitions for adjudication of wardship.  She believed Yates had simply accepted what Ernie C. told him happened and had failed to consider the best interests of the children.  Seghetti testified that Yates was a pastor and that his reports in the case did not comport with the usual standards of therapy and scientific analysis and protocols.  Based on things Ernie C. and Yates had said in the past, Seghetti believed Yates had told respondent and Ernie C. that DCFS was involved in conspiracies designed to take children away from their families.  Yates also passed on to respondent and Ernie C. some sensitive and confidential information revealed by the children's therapist in a June 1998 staffing.

After hearing the evidence, the court made extensive findings and held that respondent and Ernie C. were both unable, unwilling, and unfit.  The court adjudged the children wards of the court and ordered that the children be placed in the guardianship of DCFS.

Respondent now appeals the circuit court's adjudications of abuse and wardship, contending that the court committed reversible error in making both findings.

In addition to briefs filed by the State and respondent, we note that the Cook County public guardian, as guardian 
ad
 
litem
 for April, Amy, and Anna, has filed a brief urging that the trial court's orders be affirmed.

Respondent first contends that the trial court's decision finding her unwilling, unable, and unfit to parent her daughters was against the manifest weight of the evidence.  Specifically, respondent argues that the court's finding should be reversed where there was no evidence that she physically abused her children or Ernie C.'s grandchildren, where there was evidence she could function as a single parent, and where the trial court never warned her that remaining with Ernie C. could cause her to lose her children.

Initially, we agree with the State and public guardian that respondent, in her brief, fails to distinguish between adjudicating minors wards of the State at a dispositional hearing upon a finding that the parents are unfit, unable, or unwilling to care for, protect, train or discipline a minor, as took place here, and a finding of unfitness for the purpose of terminating parental rights.  Throughout her argument, respondent makes references to her parental rights having been "terminated" and relies upon case law in which the issue was termination of parental rights.

The petitions in this case were asking that April, Amy, and Anna be adjudicated wards of the court.  The court, through the dispositional hearing, was attempting to determine whether the children should be adjudged wards of the court on the basis that respondent and Ernie C. are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor[s] or are unwilling to do so, and that [it is in the] best interest of the minor[s] [to take them from] the custody of [their] parents, guardian or custodian."  705 ILCS 405/2-27(1) (West 1998).  The purpose of a dispositional hearing is not to terminate parental rights.  To the contrary, as described in 
In re G.F.H.
, 315 Ill. App. 3d 711, 715, 734 N.E.2d 519 (2000), a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents "fair notice of what they must do to retain their rights to their child" in the face of any future termination proceedings.  In contrast, a termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of custodial and noncustodial rights.  See 
In re P.F.
, 265 Ill. App. 3d 1092, 1101, 638 N.E.2d 716 (1994).

Although parental rights may be terminated at a dispositional hearing if certain statutory conditions are met, the record does not indicate that a termination of parental rights was sought in the instant case.  Where, as here, the State did not seek to terminate the parental rights of respondent and Ernie C., the court, upon finding respondent was unfit, unable, and unwilling, was limited to the placement options in section 2-27(1).  705 ILCS 405/2-27(1) (West 1998).  The consequences of a proceeding seeking to remove custody and guardianship from a parent following a finding of abuse or neglect and a proceeding seeking termination of parental rights for purposes of appointing a guardian with consent to adopt are different and the meaning of the term "unfit" as it relates to each proceeding is different as well.  
In re T.B.
, 215 Ill. App. 3d 1059, 1061, 574 N.E.2d 893 (1991).

Significantly, while the appointment of a guardian with the power to consent to adoption pursuant to section 2-29 requires proof of unfitness by clear and convincing evidence (see 705 ILCS 405/2-29 (West 1998)), the standard of proof in a trial court's section 2-27 finding of unfitness that does not result in a complete termination of all parental rights is a preponderance of the evidence (see 
In re Lakita B.
, 297 Ill. App. 3d 985, 994, 697 N.E.2d 830 (1998)). "On review, the trial court's determination will be reversed only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order."  
In re T.B.
, 215 Ill. App. 3d at 1062.  A finding is against the manifest weight of the evidence where a review of the record clearly demonstrates that the result opposite to that reached by the trial court was the proper result.  
In re T.B.
, 215 Ill. App. 3d at 1062.  Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision.  
In re Lakita B.
, 297 Ill. App. 3d at 994.

Respondent, in arguing that the court's decision was not supported by the evidence, points to the fact that there was no evidence that she physically abused any of the children and to the fact that there was some evidence that she could parent the children as a single parent.  Those facts, however, do not persuade us that the trial court's finding was against the manifest weight of the evidence where a review of the record reveals ample support for the court's decision.

The evidence showed that Ernie C. committed various acts of physical abuse against the children in the home, including breaking a bone of one of the grandchildren, grabbing Anna by the neck, and whipping April, Amy, and Anna with a board, belt, or hand whenever they got into "trouble."  We note that various other instances of abuse not specifically referred to in testimony during trial are noted in various reports entered into evidence.  For example, one report notes that Amy reported to her school teacher that her father had twisted her ankle "because she had been bad that weekend."

Three different caseworkers involved in the case testified that it was in the best interests of the children to be made wards of the court.  The two workers with the longest involvement in the instant case testified that they did not believe respondent was capable of protecting the children from the physical abuse of Ernie C.  Although respondent had participated in the services recommended by the various professionals involved in the case, those services had resulted in "minimal progress."  Respondent, in supervised visitations with April, Amy, and Anna, was not observed to be emotionally responsive or nurturing, had continued to interrogate the children about the foster home, and had engaged in other inappropriate behavior, such as whispering to the girls, which resulted in negative effects in the girls behavior upon returning to the foster home.  Visitation deteriorated to the point that three workers were required to be present at the supervised visitations to prevent respondent and Ernie C. from whispering to the girls.  Respondent had failed to intervene on behalf of the children when Ernie C. became volatile during visitation.  The second and most recent attempt at family therapy had been terminated due to respondent's inappropriate behavior and the first attempt had also ended, in part, due to respondent's attitude and behavior.  One report described respondent as a "battered wife who refuses to leave her husband even if the consequence is losing her children."  Another report noted that respondent failed to acknowledge the "substantial likelihood" that Ernie C. had broken Jacoba's leg through abuse despite the fact that Ernie C. "readily admits he was the perpetrator in this incident."

Julie Dvorsky, the Hephzibah worker most involved in the case, summed up much of the evidence regarding respondent in her testimony regarding why, in her opinion, it was not in the children's best interest to be returned to respondent's care:

"[D]uring the visitation, [respondent] has not used the skills necessary to parent the children or protect the children from [Ernie C.] when he's become volatile.

I have not seen that she has been emotionally responsive to her children when her children have been upset during visitation, and I have addressed that with [respondent] as well as [Ernie C.].  They haven't been able to identify the feelings that their children presented during the visit.

She has not acknowledged the abuse suffered by her children by [Ernie C.], and I do not feel the children trust her, nor do they feel that she would protect them and keep them safe."

Although there was speculation and comments in various reports to the effect that respondent might be fit to parent the children as a single parent, respondent was not a single parent and the trial court therefore noted, correctly, that the issue was not before it.

Respondent maintains that no one connected to the case, including the circuit court judges involved in the adjudicatory and dispositional hearings, informed her that if she did not leave Ernie C., she risked losing custody of her daughters.  As authority that it was required she be informed of the necessity of making such a choice, respondent relies on 
In re R.B.
, 297 Ill. App. 3d 97, 696 N.E.2d 1259 (1998).  In 
In re R.B.
, the circuit court found a mother unfit and terminated her parental rights after finding that although she had ended her own substance abuse, she continued to reside with her substance-abusing husband and had therefore "refused to make a choice for her children and against her husband."  
In re R.B.
, 297 Ill. App. 3d at 99.  On appeal, the termination of the mother's parental rights was found to be against the manifest weight of the evidence where she was never explicitly informed by the court that she must leave her husband or have her parental rights terminated.  
In re R.B.
, 297 Ill. App. 3d at 101.

We find 
In re R.B.
 to be distinguishable.  That case involved a finding of unfitness and termination of parental rights pursuant to section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 1996)).  As noted earlier, the termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of custodial and noncustodial rights (see 
In re P.F.
, 265 Ill. App. 3d at 1101), and a finding of unfitness for the purpose of terminating parental rights differs in meaning from a finding that a parent is unfit in the context of a dispositional hearing where termination of parental rights is not being sought (see 
In re T.B.
, 215 Ill. App. 3d at 1061).  Moreover, as previously noted, one of the purposes of a dispositional hearing and adjudication of wardship is to give the parents "fair notice of what they must do to retain their rights to their child" in the face of any future termination proceedings.  
In re G.F.H.
, 315 Ill. App. 3d at 715.  Considering that purpose, as well as the differences between findings of unfitness in a hearing where the termination of parental rights is being sought and a dispositional hearing where the court is determining whether a minor should be adjudged a ward of the court, we decline to extend the holding in 
In re R.B.
 requiring explicit notice to a parent that he or she must make a choice to the facts of this case, where the termination of parental rights was not at issue.  See 
In re A.D.
, 199 Ill. App. 3d 158, 161-62, 556 N.E.2d 799 (1990) (despite trial court's finding that the mother had "made commendable progress in the last two months preceding the disposition hearing," the trial court's decision to grant guardianship of respondent's three children to DCFS was affirmed where her husband was still a danger and was still a part of her life.  The appellate court noted that, following its affirmance, the respondent would "have to choose whether she wants to include [her husband] in her life or whether she wants custody of her children").

In sum, the circuit court's finding that respondent was unable, unwilling, and unfit to care for April, Amy, and Anna was not against the manifest weight of the evidence.  The fact that she herself was not alleged to have physically abused the children and might be able to parent the children as a single parent does not persuade us that the trial court's decision was against the manifest weight of the evidence where there was ample evidence that respondent continues to live with Ernie C., Ernie C. continues to be a threat to the children's safety, and respondent has not made sufficient progress in a number of areas, including her ability to protect the children from Ernie C. in the home.

Respondent also maintains that the findings of the trial court should be vacated where the court never ensured that she was aware of the consequences of entering into a stipulation admitting that her children had been abused.

During the adjudicatory stage of this case, respondent and Ernie C., represented by different counsel, entered into a stipulation.  In addition to stipulating to a number of facts, respondent and Ernie C. stipulated that April, Amy, and Anna were physically abused and subjected to excessive corporal punishment by Ernie C. and in substantial risk of physical injury.  Respondent now argues that despite the fact that she committed no actual acts of physical abuse, she entered into a stipulation tantamount to an admission that she was an abusive parent.  According to respondent, the trial court was "obligated to ensure that she was aware of the consequences of entering into such a stipulation" prior to taking the stipulation.  Where the court failed to do so, respondent concludes, the findings of physical abuse, substantial risk of physical injury and excessive corporal punishment should be vacated as to her and the cause remanded for further proceedings.

We agree with the public guardian that respondent has waived this issue by failing to raise it before the trial court.  Respondent's counsel did not raise any objection or issue related to the stipulation at the time it was entered, when it was later revisited by a motion of Ernie C.'s counsel to amend the adjudication order, during the subsequent four-day dispositional hearing, or after the court's ruling following the dispositional hearing.  Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived.  
In re Lakita B.
, 297 Ill. App. 3d at 991.

Waiver aside, we find that the entry of the stipulation of facts in the instant case does not require reversal.  Admissions under the Juvenile Court Act must be voluntarily and intelligently made.  
In re M.H.
, 196 Ill. 2d 356, 366, 751 N.E.2d 1134 (2001).

Most significantly, the record reveals that, contrary to respondent's contention that the trial court failed to advise her of the consequences of her entering into a stipulation, the court explained the nature of a stipulation and advised respondent that it would be basing its findings on the facts contained therein.  Specifically, the court, prior to respondent entering into the stipulation in the instant case, addressed respondent and Ernie C. and stated:

"We are proceeding by way of stipulation, according to the information that the court has received; that is an agreement between the parties that there will be no sworn testimony today but they are agreeing to the facts that if there was testimony those facts would be presented to the court.  You both understand?"

After respondent and Ernie C. indicated that they understood, the court informed them that "[a]fter those facts are presented to the court then the court will make its decision on those facts.  Do you understand?"  Finally, the court informed respondent and Ernie C. that they would hear the term "so stipulated" and that that term meant "agree."  The record therefore demonstrates that the court was clear in conveying that the stipulation would be entered instead of live testimony and in explaining that it would be basing its findings on the facts contained in the stipulation, and made sure that respondent understood what it was saying.

We also find significant the fact that respondent was represented by counsel at all relevant times.  Her appeal contains no allegations that her counsel was ineffective or failed to explain the nature and ramifications of the proceedings to her.

Moreover, unlike some of the cases relied upon by respondent (discussed below), the petitions in this case clearly stated, in their titles and in the bodies of the documents, that the State was seeking to have April, Amy, and Anna adjudicated wards of the court.  Such an adjudication, and no more, was the ultimate result of the proceedings.

In addition, Ernie C. entered into the same stipulation of facts.  That stipulation alone would have provided a sufficient factual basis for the trial court to make its findings of abuse.  See 
In re Johnson
, 102 Ill. App. 3d 1005, 1014, 429 N.E.2d 1364 (1981) (noting that the minor mother's stipulation of facts alone provided sufficient basis by itself for trial court's finding of neglect).

The circumstances of the instant case detailed above serve to distinguish this case from those cited by respondent.

In 
In re Johnson
, 102 Ill. App. 3d at 1012-13, the court examined the validity of the appellant's admission, noting that to be valid, such an admission in a Juvenile Court Act proceeding:

"must be intelligently and voluntarily made; that is, it must be apparent from the record that the party making the admission was aware of the consequences of his admission. [Citations.]  Thus, for the admission of a parent to be valid in the adjudicatory phase of a neglect proceeding, it must be apparent from the record that the parent making the admission understood the consequences of his admission - that a finding of neglect gives the court jurisdiction of the minor who then becomes subject to the dispositional powers of the court. [Citation.]"

The reviewing court concluded that the record was devoid of any indication that the appellant understood the consequences of his admission.  The court based its conclusion in part on the fact that the petition requested only "temporary custody" and "other appropriate relief."  The court also relied on the fact that the appellant agreed to enter an admission and agreed to the appointment of a guardian for his son prior to the appointment of counsel, and the counsel that was then appointed also represented the child's mother despite a conflict between the interests of the parties.  Finally, the court also relied on the fact that neither the trial court nor an attorney explained the consequences of the admission to the appellant, and the appellant, represented by subsequent counsel, attempted to withdraw the previously entered stipulation of facts and admission but was denied.

In 
In re Moore
, 87 Ill. App. 3d 1117, 409 N.E.2d 435 (1980), a mother contested an admission that led to the appointment of her child's maternal grandmother as guardian.  On review, the court reversed for a new adjudicatory hearing upon finding, 
inter
 
alia
, that the petition failed to apprise the respondent she could lose permanent custody of her child where it only requested temporary custody and "other appropriate relief," the court accepted the admission without addressing the respondent or determining whether counsel had addressed her regarding the nature of the proceedings, and the court was unable to determine from the record whether the respondent was aware of the nature of the proceedings.

The differences between the above cases and the instant case are readily apparent.  In the instant case, the court advised respondent as to the nature of a stipulation and of the fact that its decision would be based upon it.  In addition, the petitions in the instant case advised respondent of the nature of the proceedings.  Respondent was represented by counsel at all relevant times and does not complain that her counsel was ineffective.  Moreover, respondent and Ernie C. were represented by separate counsel to prevent any possible conflict.  Lastly, respondent made no effort to withdraw or object to the stipulation subsequent to its entry.

Finally, in 
In re M.H.
, 196 Ill. 2d 356, 751 N.E.2d 1134 (2001), also cited by respondent
(footnote: 3), the circuit court accepted the respondent's admission that she was unfit without hearing a recitation of the facts supporting the underlying petition and without determining whether a factual basis existed for an admission of parental unfitness.  The Illinois Supreme Court affirmed the Second District's judgment, which vacated the respondent's admission of unfitness where there was no factual-basis determination, reversed the order terminating the respondent's parental rights, and remanded the cause for a new fitness hearing.  
In re M.H.
, 196 Ill. 2d at 363-68.  Although respondent here does not contend that the circuit court made no factual basis determination, we note that there was more than a bald admission of abuse in the instant case.  In fact, an extensive stipulation of facts was read into the record.  The court, in finding the children had been abused, then reiterated the factual basis set out in the stipulation as the basis for its finding.  The instant case thus conforms to the dictates of 
In re M.H.

Accordingly, the findings and orders of the circuit court are affirmed.

Affirmed.

CAHILL and GORDON, JJ., concur.

FOOTNOTES
1: Ernie C. has filed a separate appeal.

2: It should be noted that the instant appeal concerns only the adjudication of wardship of April, Amy, and Anna.

3: Respondent actually cites to the Second District's opinion in that same case.  
In re M.H.
, 313 Ill. App. 3d 205, 729 N.E.2d 86 (2000).  Since the filing of briefs in the instant case, the Illinois Supreme Court filed their opinion affirming the Second District.