NOTICE

Decision filed 10/29/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240714-U

NOS. 5-24-0714, 5-24-0715 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* AURORA C. and ENOLA H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 23-JA-226, 23-JA-227 |
| | ) | |
| Briana H., | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The adjudicatory orders of the circuit court of Macon County that found the minor children to be abused and/or neglected and the subsequent dispositional orders are affirmed because the circuit court's findings were not against the manifest weight of the evidence.

¶ 2     The respondent, Briana H. (Mother), appeals the circuit court of Macon County's May 10, 2024, findings that her biological minor children, Aurora C. (Aurora) and Enola H. (Enola), were abused and/or neglected, and the June 4, 2024, findings that it was in the children's best interest to become wards of the court. Mother challenges both orders on appeal. The children's fathers are not parties to this appeal. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     This case began with the filing, on November 13, 2023, of *inter alia*, petitions for adjudication of abuse, neglect, or dependency, regarding Briana H.'s biological children, Aurora, who was born in May 2022, and Enola, who was born in January 2019. The petition regarding Aurora was filed in Macon County case No. 2023-JA-226. The petition regarding Enola was filed in Macon County case No. 2023-JA-227.

¶ 5     The filing of the petitions was precipitated by Aurora, age 18 months, being presented to the emergency department on November 7, 2023, with "days' old burn injuries to her feet, bruising on her back and face in different states of healing, and signs of an older tibia fracture." It was alleged that only Mother, her live-in paramour, and the children's grandmother had recent access to Aurora.

¶ 6     The petition regarding Aurora alleged three counts. Count I of the petition alleged that Aurora was neglected, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)), by reason of being a minor whose environment was injurious to her welfare. Count II alleged that Aurora was abused, pursuant to section 2-3(2)(i) of the Juvenile Court Act (*id.* § 2-3(2)(i)), by reason of being a minor

         "whose parent, immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function."

Count III alleged that Aurora was abused, pursuant to 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)), by reason of being a minor

> "whose parent, immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent creates a substantial risk of physical injury to such minor by other than accidental means, which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function."

The basis for each of these counts was the aforementioned November 7, 2023, visit to the emergency department and Aurora's injuries documented by the emergency department personnel.

¶ 7 The petition regarding Enola also alleged three counts. Count I of the petition alleged that Enola was neglected, pursuant to 2-3(1)(b) of the Juvenile Court Act, by reason of being a minor whose environment was injurious to her welfare. Count II alleged that Enola was abused, pursuant to 2-3(2)(i) of the Juvenile Court Act, by reason of being a minor

> "whose parent, immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function."

Count III alleged that Enola was abused, pursuant to section 2-3(2)(ii) of the Juvenile Court Act, by reason of being a minor

"whose parent, immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent creates a substantial risk of physical injury to such minor by other than accidental means, which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function."

The basis for each of these counts was the aforementioned November 7, 2023, visit to the emergency department that documented injuries to Enola's sibling.

¶ 8 On November 13, 2023, a shelter care hearing was held regarding Aurora and Enola. Mother was present at the hearing, and she stipulated to probable cause to believe the minors are neglected, abused, or dependent and that it was a matter of immediate and urgent necessity that the minors be placed in shelter care and that reasonable efforts had been made or good cause shown why reasonable efforts could not prevent or eliminate the necessity of the removal of the minors from their home. Mother was instructed to cooperate with the Illinois Department of Children and Family Services (DCFS), comply with the terms of the service plan, and correct the conditions that required the children to be in care.

¶ 9 Mother underwent an integrated assessment. Following the assessment, the following recommendations were made to address safety and the reasons why the children came into care: participate in parent coaching, participate in counseling services, and participate in random drug screens.

¶ 10 On April 24, 2024, a consolidated adjudicatory hearing was held regarding both minors. Mother was present with counsel. Aurora's father, Corey O., was present with counsel, and Enola's

4

father, Christian H., was present with counsel. The children's guardian *ad litem*, Brian Finney, was also present.

¶ 11    The State called Channing Petrak, M.D., as its first witness. Dr. Petrak testified that he had been a licensed physician since 2003. He is board certified in general pediatrics and child abuse pediatrics. He was employed at the Pediatric Resource Center. Dr. Petrak was recognized as an expert witness without objection.

¶ 12    Dr. Petrak testified that his office was contacted by DCFS to help with a medical evaluation for Aurora. Dr. Petrak testified that he reviewed Aurora's primary care records and the St. John's hospitalization records, which included laboratory studies, radiology studies, and photographs. Dr. Petrak reviewed both color photographs and black-and-white photographs, which are contained in the record on appeal before us. Dr. Petrak also examined Aurora approximately two weeks after her hospitalization.

¶ 13    Dr. Petrak testified that the photographs of Aurora's feet displayed a burn most consistent with a thermal burn, meaning something hot damaged the skin. He testified that, "[w]ith a thermal burn, what you see is tissue damage. You see peeling at the edges, which is where the blister would have been and then peeled off." He testified with a friction burn, you will see signs of friction on the skin. He explained that with friction burns,

> "[y]ou can see skin being removed, but you don't actually see blisters like you do with a thermal burn, and you can typically see where the skin was damaged by the object that damaged it, and you can see usually linear marks within it because that's where the friction was applied."

Dr. Petrak testified that thermal burns can be caused by hot liquid, or a hot object placed on the skin.

¶ 14   Regarding Aurora's burned feed, Dr. Petrak opined that,

"[g]iven that it was on the top of her feet and there is a curved surface, it would have to be something that could either compress that area or conform to that area. Her burns on her feet look like they could have been due to potentially an immersion, just because of the bottoms of the feet appeared to be spared, which happens with an immersion burn. It could also have been that something hot was poured on them, but that's a little more complicated, but something hot placed on the feet, basically."

Dr. Petrak explained that an immersion burn could occur from placing a child in a hot liquid, such as a scalding bath. He explained the bottoms of the feet are spared from the burn because they are in contact with the cooler surface of the tub. Dr. Petrak's medical opinion was that Aurora's burns were the result of something that was done to her.

¶ 15   Dr. Petrak testified regarding a series of bruises on Aurora that were also photographed. Dr. Petrak testified that other than the bruising on Aurora's forehead, he found the remaining bruises concerning. The bruising on her neck, ears, torso, abdomen, and buttocks "is highly suspicious of abuse at her age and does not result from, you know, typical play. They don't hit those areas hard. Those areas are hard to bruise." The bruises were on multiple planes of her body which was also suspicious. Dr. Petrak testified that it was his "opinion that her burns and her bruises, with the exception of the forehead bruising, was due to child physical abuse."

¶ 16   The radiology studies also revealed a healing tibia fracture. Dr. Petrak was unable to determine the type of fracture, so he did not opine that it came from abuse. However, he was concerned about neglect because there were no medical records indicating any treatment for the fracture.

¶ 17    The State also presented testimony from Rita Wise, the investigator that responded to the hospital, and Detective Eric Matthews, who was assigned to investigate the situation involving Aurora. The adjudicatory hearing was continued to May 8, 2024.

¶ 18    On May 8, 2024, the State continued its presentation of evidence with the testimony of Jennifer Pacha, a DCFS investigator who responded to the hospital. She took photographs of Aurora's injuries.

¶ 19    Next, Mother called Paula Clark as a witness. Clark is Aurora's maternal great-aunt. She testified that Aurora has been in her care. She testified that Aurora has a permanent mark on her inner ear and belly. She testified that Aurora began walking while in her care.

¶ 20    Next, Mother called Judith Clendenen as a witness. Clendenen is Mother's mother and grandmother to Aurora and Enola. Before being taken into care, Enola and Aurora lived in the same household with Clendenen, Mother, and her paramour, Cole.

¶ 21    Clendenen testified that on November 5, 2023, it was a nice day and Aurora and Enola played outside much of the day. She testified the children were not given a bath after playing outside. Rather, Clendenen testified that she cleaned up Enola and "[j]ust used a baby wipe and washed her up." She testified that Mother "took care of Aurora and just washed her up. Then, we had dinner." She testified that when Aurora went to bed on November 5, 2023, her feet were "a little pink like maybe she'd gotten a sunburn just being outside, you know."

¶ 22    Clendenen testified that the first time anyone noticed that anything was wrong with Aurora was when Mother came home from work on November 6, 2023, at approximately 1 p.m. She testified as follows:

7

"[Mother] had went in and got Aurora, changed her butt, and then brought her in the living room. And she was holding her on her hip, and her foot bumped my body and it made Aurora cry a little bit.

So, Aurora had gotten—the same day as the birthday party, Aurora had gotten a blister on her right foot on the inside of her big toe—right on the outside of her big toe. And so it had healed and had a scab on it, but she was concerned that maybe some infection or something had come from that.

So, she was concerned and said, 'Take her sock off and let me see what it looks like.' She didn't know why she cried. So, Cole removed sock on the right foot, and that's when we saw the blister that was about like that. And then she said, 'What about her other foot?' and I removed the sock on the left foot, and that was the worst one. And it looked like I had literally peeled skin off the top of the blister. It was all pink and wet, like right after you take the skin off a blister."

¶ 23 Mother then testified on her own behalf. Mother testified consistently with Clendenen's version of events of November 5 and 6, 2023. Mother testified that she put socks on Aurora before she placed her in a walker. Mother testified that she was not aware of anything that happened on November 5 that would have caused the burns to Aurora.

¶ 24 Next, Corey O. (Corey) testified on his own behalf as respondent father of Aurora. Corey testified that he previously lived with Mother and Clendenen for approximately one year. He testified that he left the household approximately a month before Aurora's first birthday. He testified that Mother and Clendenen would "yell at the kids for asking for food. Any basic necessities, they would pretty much punish Enola." He testified they would punish Enola by smacking her hand. He also testified the home was dirty due to cats.

¶ 25    On cross-examination, Corey was asked if he lied about Mother and Clendenen. He denied this. A Facebook post regarding Aurora being burned with cigarettes was also discussed. Corey testified that is what he was told when he initially learned of Aurora's burns. Corey was the final witness to testify.

¶ 26    At the conclusion of the adjudicatory hearing on May 8, 2024, the circuit court made the following oral pronouncements:

"It was Dr. Petrak's opinion the burns on the feet and the bruises were indicative of child abuse. So, I find that the State has shown by a preponderance of the evidence that Aurora [C.] is neglected, abused—neglect and abused. All counts are proven.

As for Enola, this is just an anticipatory neglect case. She's not the subject of this, but I don't believe it would be safe to return her home either. So, I'll find that the State has shown by preponderance of the evidence Count I[.] Counts II and III in 227 are dismissed."

¶ 27    Written adjudicatory orders were entered on May 10, 2024. The adjudicatory order in Aurora's case found that, based upon physical abuse inflicted on the child, she was abused and neglected due to an environment that is injurious to her welfare, physical abuse, and substantial risk of physical abuse. The adjudicatory order in Enola's case found that, based upon physical abuse to her sibling, the home is unsafe and she is neglected due to an environment that is injurious to her welfare.

¶ 28    A consolidated dispositional hearing was conducted on June 4, 2024. The first witness called by the State was Jacob Johnson-Grubaugh. Johnson-Grubaugh testified that he is a child welfare specialist for DCFS, and he was assigned as the caseworker for Aurora and Enola. Regarding Enola, he testified that it was his recommendation that Enola be made a ward of the court, that DCFS be granted guardianship, and that custody of the child remain with her father.

DCFS guardianship was recommended in order to facilitate visitation between Mother and Enola. Regarding Aurora, he testified that it was his recommendation that Aurora be made a ward of the court, that DCFS be granted guardianship, and that custody of the child remain in substitute care.

¶ 29 Johnson-Grubaugh testified that Mother had started parenting classes and was rated as satisfactory. She is currently rated as unsatisfactory with mental health services just due to the number of therapy sessions so far and lack of progress.

¶ 30 Corey testified on his own behalf. He testified that he was willing and able to care for Aurora. Prior to Aurora being placed in care, Corey had not seen her since just before her first birthday. He testified that his attempts to contact Mother were blocked.

¶ 31 Brian Finney, the children's guardian *ad litem*, agreed with the recommendations of the State. He also noted that he would like to see visitation between Corey and Aurora, so he is not a stranger to her.

¶ 32 The circuit court entered written dispositional orders on June 4, 2024. The orders found that Mother was unfit to care for, protect, train, educate, supervise, or discipline the minors and placement with her is contrary to the health, safety, and best interests of the minors because Mother needs to further engage in services. Further, reasonable efforts and appropriate services aimed at family reunification have been made, but they have not eliminated the necessity for the removal of the minors based on the injuries sustained to Aurora.

¶ 33 Mother filed timely notices of appeal in each case. The cases were consolidated for appeal.

¶ 34                                    II. ANALYSIS

¶ 35 The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). The first step

10

of the process begins with the State filing a petition for wardship. *Id.* Then, a temporary custody hearing is conducted at which the court must "determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal." *Id.* If probable cause is found, the child is placed in temporary custody and the process continues. *Id.*

¶ 36     The second step of the process, the adjudicatory hearing, requires the court to determine whether the child was the subject of abuse, neglect, or dependence. *Id.* "Section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2000)) defines a 'neglected minor' to include 'any minor under 18 years of age whose environment is injurious to his or her welfare.' " *Id.* The general definition of "neglect" is the " ' "failure to exercise the care that circumstances justly demand." ' " *Id.* at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). "Neglect" is not limited or fixed to this definition. By necessity, "neglect" is fluid and includes both willful and unintentional disregard of duty. *Id.* Similarly, "injurious environment" does not have a fixed definition, but has been interpreted to include " 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 37     Section 2-3 of the Juvenile Court Act defines an abused minor as,

"Those who are abused include any minor under 18 years of age *** whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same home as the minor, or a paramour of the minor's parent:

(i) inflicts, causes to be inflicted, or allows to be inflicted upon such minor physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function; [or]

(ii) creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function[.]" 705 ILCS 405/2-3(2)(i)-(ii) (West 2022).

¶ 38 "At the adjudicatory hearing, 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *In re A.P.*, 2012 IL 113875, ¶ 19 (quoting 705 ILCS 405/2-18(1) (West 2010)). The purpose of an adjudicatory hearing is "to determine whether the allegations of a petition *** that a minor under 18 years of age is abused, neglected or dependent *** are supported by a preponderance of the evidence." 705 ILCS 405/1-3(1) (West 2022). The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected and/or abused.

¶ 39 Cases involving allegations of neglect and abuse and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *In re Juan M.*, 2012 Il app (1st) 113096, ¶ 49. It is the State's burden to prove allegations of abuse neglect by a preponderance of the evidence, meaning the State must prove the allegations are more probably true than not. *Id.*

¶ 40 The circuit court has the opportunity to observe the demeanor and conduct of the parties and witnesses and is in the best position to determine credibility and weight of the witnesses' testimony. *Id.* On review, a finding of abuse and/or neglect will not be reversed unless it is against

the manifest weight of the evidence. *Id.* This court will not disturb the circuit court's findings unless the record clearly demonstrates that the court should have reached the opposite result or that the court's determination is unreasonable, arbitrary, and not based on evidence. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the petition must be dismissed. *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 41 If a finding of abuse, neglect, or dependence is made, the third step is reached, at which point the circuit court must hold a dispositional hearing to determine whether "it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." 705 ILCS 405/2-21(2) (West 2022).

> "At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public. The court also shall consider the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." *Id.* § 2-22(1).

"The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather, "a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling

on whether to make a minor a ward of the court gives the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *Id.*

¶ 42    On appeal, Mother argues that the circuit court's findings that Aurora was an abused and neglected minor and that Enola was a neglected minor were against the manifest weight of the evidence. The basis of the foregoing findings was the physical abuse of Aurora. Mother argues that the circuit court erred in finding that Aurora was physically abused based on the expert testimony of Dr. Petrak. Mother contends the circuit court "completely ignored" the contradictory testimony submitted by Mother that she did not know how the burns occurred but speculated that it could have been a friction burn. Dr. Petrak testified that in his medical opinion, Aurora's injuries were not friction burns nor from an infection. The circuit court was in the best position to consider and weigh this competing testimony. The circuit court's finding that Aurora was physically abused as evidenced by her thermal burns and bruising was not against the manifest weight of the evidence. Accordingly, the findings that Aurora was also at substantial risk of physical abuse and that she was neglected by being in an environment injurious to her welfare were not an abuse of discretion. Enola was found to be neglected due to being in an environment injurious to her welfare due to the finding of her sister's physical abuse and the concern for anticipatory neglect of Enola. This was not against the manifest weight of the evidence.

¶ 43    Next, we turn to Mother's argument that the circuit court's determination that Mother was unable, at the time of the dispositional hearing, to parent the children was against the manifest weight of the evidence. The purpose of the dispositional hearing is to determine what is in the best interest of the minor children. *Id*. At this stage, the parent's rights are not terminated; rather, they are given notice of what they must do to retain their rights to their children. *Id.* In this case, Mother was applauded for beginning services; however, additional services were still needed. After

14

reviewing the record, we find it was not against the manifest weight of the evidence to make the children wards of the court, grant guardianship to DCFS, and place the children in the care of someone other than Mother.

¶ 44                                  III. CONCLUSION

¶ 45    For the foregoing reasons, we affirm the orders of the circuit court of Macon County entered on May 10, 2024, and June 4, 2024, regarding Aurora and Enola.

¶ 46    Affirmed.