# Illinois Official Reports

## Appellate Court

---

## *In re C.L.*, 2018 IL App (1st) 180577

---

| | |
|---|---|
| Appellate Court Caption | *In re* C.L., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Makiah L., Respondent-Appellee (C.L., Respondent-Appellant)). |
| District & No. | First District, Third Division<br>Docket No. 1-18-0577 |
| Filed<br>Rehearing denied | November 21, 2018<br>January 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-JA-638; the Hon. John L. Huff, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Charles P. Golbert, Acting Public Guardian, of Chicago (Kass A. Plain, and Mary Brigid Hayes, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>Thomas M. O'Connell, of Chicago, for other appellee. |

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.


**OPINION**

¶ 1        Minor-respondent-appellant C.L., through the Office of the Cook County Public Guardian (Public Guardian), petitioned to appeal the trial court's March 8, 2018, permanency order setting the goal of return home to mother, Makiah L., within 12 months. We granted leave to appeal under Illinois Supreme Court Rule 306(a)(5) (eff. Nov. 1, 2017). C.L. contends that the court erred in setting the permanency goal of return home because the manifest weight of the evidence showed the goal of private guardianship was in C.L.'s best interest. Further, C.L. argues that the court incorrectly interpreted section 2-27 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-27 (West 2016)) when it stated that ordering private guardianship would require an additional finding that Makiah was unable to care for C.L. For the reasons that follow, we reverse and remand.

¶ 2                                    I. BACKGROUND
¶ 3        C.L. was born on March 2, 2013, to Makiah and Rodney T.[1] Prior to C.L.'s birth, the Department of Children and Family Services (DCFS) had opened cases against Makiah in regards to her six other children.[2] Upon learning of C.L.'s birth, DCFS attempted to contact Makiah and assess C.L.'s condition. When these efforts failed, the State filed a petition for adjudication of wardship alleging C.L. was neglected and abused due to the existence of an injurious environment and a substantial risk of injury. See 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2016). The State moved for temporary custody in conjunction with filing the petition, and a hearing was conducted on July 12, 2013. The court found probable cause that C.L. was neglected, there was an immediate and urgent necessity to remove C.L. from the home, and reasonable efforts had been made but had not eliminated the need for removal. The court issued a child protection warrant, and C.L. was taken into DCFS custody and assigned a caseworker from Children's Home and Aid (agency) the following week. C.L. was placed in a foster home with Shawna and Kevin Koonce and has resided there throughout the pendency of this case.

¶ 4        In August 2013, Makiah was granted supervised visits with C.L. and ordered to attend mediation in the following months to discuss placement, visitation, and services. Over the next year, the case was repeatedly continued pending status on service against Rodney until he was defaulted against in June 2014. On October 30, 2014, the court heard arguments on the allegations of abuse and neglect and took the case under advisement. An adjudication order was issued on December 10, 2014, finding that C.L. was neglected under the theory of

---

[1]Rodney has never filed an appearance in this case and is not involved with this appeal.

[2]Five of Makiah's sons were adjudicated to be neglected in 2004. Makiah's sixth son was taken into DCFS custody shortly after birth as a substance-exposed infant in 2009. At the time of this order, Makiah's sons are between the ages of 8 and 22 and her parental rights were terminated as to the four younger brothers.

anticipatory neglect.[3] The court rejected the abuse allegations and explained that neglect was found only because "[Makiah] hadn't advanced to unsupervised overnight visits and never corrected issues from other involved children or completed recommended services." These facts were sufficient to prove by a preponderance of the evidence that C.L. was neglected. The parties waived the requirement for a dispositional hearing within 30 days of adjudication and set the next hearing for March 6, 2015.

¶ 5    The dispositional hearing was held over three court dates between March and June 2015. On June 2, 2015, the court entered an order finding that Makiah was unable to care for, protect, train, or discipline C.L. The court also entered the first permanency order setting the goal of return home in 12 months and reserving the issue of mother's progress toward the goal. At the next two permanency hearings, the court noted that Makiah had made "some," but not substantial, progress toward the goal. The court maintained the goal of return home within 12 months, despite the agency's recommendation for substitute care pending termination of parental rights.

¶ 6    The Public Guardian and state's attorney agreed, at the hearing on December 2, 2015, that it was too early to seek termination of parental rights because more services could be offered before ruling out return home. However, at the hearing on June 22, 2016, both the Public Guardian and state's attorney noted for the record that they agreed with the agency's recommendation for substitute care pending termination of parental rights. The court explained that it found return home was not possible at the time, because mother had not been in or had not been consistent with services aimed toward reunification, but that a goal of return home should not be ruled out. During this time period, Makiah was granted supervised community visits in addition to supervised visitation at the agency.

¶ 7    In the fourth permanency order entered on January 12, 2017, the court found that Makiah had made substantial progress despite recognizing that mother had unsatisfactory drug testing results and was still in need of child-parent psychotherapy (CPP) and individual counseling. The court further remarked that Makiah had been consistent in attending visitation with C.L. and acknowledged that C.L. exhibited aggressive behavior during these visits. The court maintained the goal of return home within 12 months, yet again against the recommendation of the agency and over the objection of the Public Guardian.

¶ 8    After this order was entered, Makiah sought the right to have unsupervised visits with C.L. Conversely, the Public Guardian sought to suspend visitation or limit visitation to therapeutically supervised visits citing concerns that visits increased C.L.'s behavioral issues. On March 16, 2017, the court denied the Public Guardian's motion to suspend visitation and granted Makiah unsupervised weekend visits in addition to the regular supervised weekday visits. The Public Guardian later filed an emergency motion to suspend visitation following a report that Makiah had hit C.L. in the face during an unsupervised visit on April 29, 2017. The court denied the motion to suspend visitation as well as the Public Guardian's subsequent

---

[3]"Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). "The doctrine of anticipatory neglect recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 30.

motion to reopen proofs and reconsider the motion. Over the objections of the Public Guardian and state's attorney, the court entered an order on June 19, 2017, continuing unsupervised Saturday visits and allowing for unsupervised overnight visits to occur at the discretion of DCFS.

¶ 9 The next permanency hearing, which is at issue in this appeal, spanned five hearings beginning in August 15, 2017, and ending with the court's ruling on March 8, 2018. The court took judicial notice of the previous hearings in the case and the court's notes, in addition to the termination of Makiah's parental rights as to four of her six other children. The following testimony was given on February 23, 2018, in addition to the 21 exhibits entered into evidence during the hearings.

¶ 10 Jane Wright, Makiah's neighbor, testified that she had lived in the apartment across the hall for the past year. Wright has a five-year-old grandson who would play with C.L. on Saturdays during Makiah's unsupervised visits. The play dates had occurred regularly for five or six months. Wright would drop off her grandson and spend around 20 minutes with the boys and Makiah before leaving them to play. During these times she noted that C.L.'s behavior was "out of control." In the last two months, she saw C.L. become violent with Makiah, kicking and biting his mother while she tried to "hold him down" until he calmed down. Wright never saw Makiah hit C.L. She testified that she heard C.L. say things like his "other mommy" told him to act out and to say he did not like Makiah.

¶ 11 C.L.'s foster mother, Shawna, denied saying anything disparaging about Makiah to C.L. or instructing him to act out. She did not believe it would be beneficial for C.L. if his relationship with Makiah was damaged. In her oral report on C.L.'s status, she noted some improvement in his behavior at school and ability to express himself in therapy. However, C.L. would verbally express a dislike for the visits with Makiah and often cry or have tantrums when he left for visits. Shawna stated he would "destroy his room" and she would try to calm him down by reminding him that she was there for him and would be there when he returned from the visits.

¶ 12 Shawna was pressed on cross-examination as to whether she ever said positive things about Makiah to C.L. Shawna testified that she would tell C.L. to be good for his mom, that Makiah was a good person who loved him, so he should be nice to her and go to the visits. Shawna acknowledged that she and Makiah only had an "okay" relationship and they needed to work on it in the future, which she was willing to do. She also testified to her prior experience in maintaining familial bonds between her adopted daughter and her daughter's biological family. Shawna expressed that her daughter was an example that she meant what she said and she understood the importance of maintaining Makiah's relationship with C.L. as well as C.L.'s relationship with his other siblings.

¶ 13 Makiah testified that during visits C.L. would call her "stupid" and say it was because his foster parents thought Makiah was stupid. Further, C.L. would relate that his foster parents did not like her and would tell C.L. he does not have to listen to her. Makiah claimed that C.L. admitted he was lying to Makiah and was instructed to say mean things during their most recent CPP session on February 20, 2018. Makiah further testified that the CPP therapist, Shakira Harris, intervened and explained to C.L. that it was not okay to tell lies and it was not nice for C.L. or C.L.'s foster parents to tell him to do that to Makiah.

¶ 14 Harris was not present at the hearing but was called as a rebuttal witness and testified telephonically. She stated that during the last therapy session, C.L. did not tell her that his foster mother told him to fight and hit Makiah. Further, C.L. did not bring up his foster mother

at all. He did, however, accuse Makiah of hitting him on the bus while travelling to the session. When pressed for clarification on the alleged hit, C.L. stated he was just kidding and he was trying to "get rid of the visit." C.L. explained that he liked to see Makiah and the visits at her apartment, but he was tired of coming to the agency.

¶ 15    Harris submitted a report detailing Makiah and C.L.'s progress in CPP from October 2017 through January 2018. During this time period, Makiah attended nine sessions, two sessions were cancelled by Harris, and two sessions were cancelled by Makiah because she was late. Harris reported that Makiah and C.L. were both making progress in regulating their emotions and interacting with each other in a safe manner. Additionally, C.L. had become more expressive in therapy. However, he would ignore expressions of affection by Makiah and expressed anger and frustration over the compulsory visits. Further services were recommended for Makiah to establish herself as a "protective, benevolent, legitimate authority figure" in C.L.'s life and to improve the emotional bond between the two.

¶ 16    Anne Gamache, the therapist who provided individual play therapy for C.L., also testified and submitted reports regarding C.L.'s progress. She had worked with C.L. since he was referred to her services in January 2017. Her quarterly report for October 12, 2017, through January 11, 2018, recommended that visitation with Makiah be discontinued. She detailed that C.L. sought out his foster mother Shawna as a secure base and source of nurturing and emotional security. In contrast, when asked about Makiah, C.L. consistently avoided discussing her and his visits with her. He would instead ask to just play or ignore Gamache's questions. During his play therapy, C.L. exhibited symptoms of posttraumatic stress disorder. Further, although his dissociation and aggression had decreased during the reporting period, his anxiety had increased. C.L. had learned coping skills to regulate his emotions and can when his emotions are moderate, but he would leave the therapy space and seek out Shawna for physical nurturing whenever he was overwhelmed.

¶ 17    In an addendum submitted on February 19, 2018, Gamache reported that C.L. was having nightmares where he could not come home. He also acted out scenarios during play therapy where a stuffed animal attacked Gamache in an effort to steal a baby doll that C.L. had entrusted to Gamache's care. C.L. also expressed a fear that Makiah, whom he referred to as "the evil mom," would come to his foster home and break all the windows. Lastly, C.L. reported on February 13, 2018, that he had been hit, scratched, and spanked on a visit. However, C.L.'s report was unclear as he referenced both the visit earlier in the day prior to the session and another visit "a long time ago."

¶ 18    Gamache testified during the hearing that, in the latest session, after she had submitted her addendum, C.L. again reported being hit by Makiah. C.L. stated Makiah had hit him in the face during the visit that day. Gamache reported this incident to the DCFS hotline and testified that she had not done so after the last session because she observed no marks on C.L. and he had not provided a concrete time frame for the allegation. Gamache also testified about her recommendation that visitation be discontinued. She expressed concerns that C.L. had expressed an unwillingness to attend visits and during one observed visitation sought comfort from Gamache rather than Makiah. Further, despite fairly consistent visits for the past year, C.L.'s negative behaviors had not decreased nor did he show the development of a positive relationship with Makiah.

¶ 19    Amanda Moore, the agency's caseworker, testified that she had been assigned to the case in November 2017. Her most recent visit to C.L.'s foster home was February 16, 2018. A few

days after that visit, an investigation was opened following the hotline call by Gamache. Makiah's unsupervised visitation schedule was suspended pending the results of the investigation. The agency was attempting to find staffing solutions to implement the same visitation schedule with agency supervision as the previously unsupervised visits. Moore testified that she observed a strong emotional bond between C.L. and Shawna. She was concerned that a majority of the time Makiah's efforts to soothe C.L. were unsuccessful and a substantial amount of time would be required before Makiah was ready to care for C.L. on her own.

¶ 20    Moore testified that, during the most recent staffing meeting, she met with her supervisor, a clinical supervisor, and C.L.'s CPP therapist Harris and they determined that private guardianship would be best for C.L. in order to introduce more stability into his life. Due to the hearing being continued across several months, the agency had prepared four separate permanency planning reports for the court to review. The report prepared in February 2018, after the staff meeting about which Moore testified, was the first time the agency had changed their recommendation to private guardianship.

¶ 21    The August 2017 report stated that the agency would not be able to recommend a permanency goal until the latest parenting capacity assessment conducted by Jo Anne Smith was completed for Makiah. After Smith's assessment had been filed, the agency recommended substitute care pending termination of parental rights in September 2017. The agency then reversed their position and recommended return home within 12 months in the report from December 2017. The agency recommended that Makiah and Shawna attend mediation and wrote, "even though [C.L.]'s therapist and Ms. Smith are requesting that the Court move away from a reunification goal, the agency believes that the 'system' has an obligatyion[*sic*] to make further attempts to bring the two most important people in [C.L.]'s life together before any change in goal be entertained."

¶ 22    Consistently across the four reports, the agency noted that Makiah's compliance with random drug screening was unsatisfactory and remained a serious concern preventing reunification. Between June 2017 and February 2018, Makiah missed 12 requests for drug drops. Of the four she completed during this period, three were positive for the presence of drugs. Her only clean drop was on September 6, 2017. The reports acknowledged Makiah was making some progress in her parenting skills but also noted her tendency to shut down or cancel visits and therapy sessions when C.L. misbehaved. C.L.'s disruptive behaviors at school had not subsided, and he frequently exhibited a reluctance to attend visits and would verbally and physically resist the case aide's attempt to transport him to visits.

¶ 23    Further, although not discussed at the hearing, the August report noted that unsupervised visits at Makiah's home were suspended when her third eldest son, who was still under DCFS care, moved home in an unauthorized self-placement. The agency found that Makiah's older son posed a risk to C.L.'s safety. The older son was not compliant with his medication or mental health services and reported to be affiliated with a gang in addition to being allegedly pursued after selling illegal substances. He later moved out as reflected in the February report and visitation in the home was allowed to resume.

¶ 24    The parenting capacity assessment report relied upon by the agency was completed by Jo Anne Smith on September 5, 2017. Smith drew her observations from her interviews with Makiah and Shawna; her observations of C.L. alone and C.L. with Makiah; her review of all relevant documents, including Makiah's previous psychiatric evaluations and mental health

assessments; and discussions with or reports from other parties involved with the case. In a thorough report, Smith noted concerns that Makiah saw herself as a victim and relied on placing blame on external factors as a coping mechanism. Makiah seemed to lack insight into the consequences of her actions and her lengthy involvement with DCFS. Despite her continued desire to parent and her consistency in showing up, Makiah had failed to integrate what she had learned into her interactions with C.L. She exhibited some understanding of C.L.'s emotional and developmental struggles but could not consistently address C.L.'s issues in an age-appropriate and constructive manner. Makiah continued to have serious risk factors preventing return home including placing her own needs above C.L.'s as exhibited by her continued reliance on drugs to self-medicate.

¶ 25 In regards to C.L.'s emotional and mental state, Smith noted that C.L. struggled with trust issues and appeared consistently anxious about the roles of the adults in his life. Smith posited that C.L. had picked up on the feelings of conflict between Shawna and Makiah and felt disrupted due to the constant shuffling he experienced while in the system. Smith was concerned that Makiah's tendency to give up when things got tough would be an issue if C.L. returned home and she became responsible for him full-time. Smith then outlined all the necessary recommendations if the court chose to move forward with either return home or permanency in the foster placement. In an addendum to her report, Smith clarified that in her professional opinion, "the risk factors outweigh the strengths of [Makiah] at this time." She felt that "time has appeared to run out" and that return home should no longer be considered as C.L.'s behaviors were continuing to escalate. Smith wrote that minor's return home to a mother who did not have the skills to soothe him may result in C.L.'s behavior escalating to the point that he would have to be hospitalized. She recommended that C.L. be placed with "safe, tolerant, consistent, and predictable parental figures who will help him work through his emotional and developmental issues."

¶ 26 At the close of testimony on February 23, 2018, the court continued the hearing noting that it wished to speak with C.L. and hear C.L.'s feelings before ruling on the permanency goal. The court discussed its concerns that the finding of neglect at adjudication had been a "very close" decision and mused over whether it "made a mistake" that resulted in the system causing C.L.'s misbehaviors and anxiety. On March 6, the court reversed its decision to speak with C.L. per the therapist recommendation that such a discussion would place undue stress on C.L. However, prior to hearing arguments on March 8, the court noted for the record that it had come across the opportunity to speak to C.L. in an informal *ex parte* meeting after the last hearing. The substance of the conversation between the court and C.L. were not entered on the record.

¶ 27 Despite the arguments of the Public Guardian and the state's attorney, the court entered an order setting the permanency goal of return home within 12 months. The court also found that Makiah had made substantial progress toward the permanency goal and reserved the issues of whether the agency had made reasonable efforts and if C.L.'s placement is necessary and appropriate. This appeal followed.

II. ANALYSIS

¶ 29     C.L. raises two challenges to the court's March 8, 2018, permanency order. First, he contends that the trial court ignored the manifest weight of the evidence, which demonstrated that it was in his best interest to change the permanency goal to private guardianship rather than return home. Secondly, he argues that the court's justification for denying the State's request for private guardianship was based on a flawed interpretation of the Act. C.L. requests this court reverse the permanency goal of return home within 12 months and remand the case with instructions to set a permanency goal of private guardianship.

¶ 30     The state's attorney agrees that the trial court failed to consider the C.L.'s best interest in setting the permanency goal of return home within 12 months. However, the state's attorney does not adopt C.L.'s arguments and instead requests remand of the case with instructions for the trial court to fully consider C.L.'s best interest at a new permanency hearing. Makiah responds that the trial court's interpretation of the statute was correct and that the manifest weight of the evidence supported a permanency goal of return home, and thus, this appeal should be denied.

¶ 31                                  A. The Juvenile Court Act

¶ 32     Before ruling on the appropriate permanency goal, the trial court asked counsel multiple times why it should set private guardianship as the goal if they did not present evidence that Makiah was unable to care for C.L. The trial court stated that looking at section 2-27(1) of the Act, "I'm required to find that the parent is unable to care for the child before I can close this case to private guardianship." Although a motion to close the case to private guardianship was not before the trial court, the court asked, "why should I set the goal at private guardianship if that's a finding that I'd have to make?" Counsel argued that section 2-27(1)'s directive to make a finding of fitness and ability was applicable at the dispositional hearing but is not a determination made during the permanency hearing. However, the court responded, "My reading of the Juvenile Court Act is that Sections 2-22 and 2-23 govern the dispositional hearing." Thus, the court continued to apply section 2-27(1) to the permanency hearing and rejected arguments that fitness, ability, and willingness were not under review in a change to private guardianship.

¶ 33     C.L. asserts that the plain language of the statute indicates that the trial court makes an initial finding regarding fitness, ability, or willingness during the dispositional hearing and this finding is sufficient to grant the trial court authority to order placement in private guardianship "at any later point" during the case, provided that it is in the minor's best interest. Further, section 2-28 directs the trial court to "determine the future status of the child" and set a permanency goal which aligns with the child's best interest. 705 ILCS 405/2-28 (West 2016). C.L. highlights that this section does not instruct the trial court to make an additional finding of a parent's fitness, ability, or willingness to care for their child. Thus, C.L. contends that the trial court's reading of the statute is incorrect because it renders the phrase "at any later point" in section 2-27 superfluous.[4]

¶ 34     The construction of a statute is a question of law and our review is *de novo*. *In re M.M.*, 2016 IL 119932, ¶ 15. The primary rule of statutory construction is to ascertain and give effect

---

[4]We address the minor's second argument first because the court's interpretation of the Act affects how it weighed the evidence, which we will discuss later.

to the intent of the legislature. *Id.* The most reliable indicator of legislative intent is the language of the statute, which should be given its plain and ordinary meaning. *Bayer v. Panduit Corp.*, 2016 IL 119553, ¶ 18; *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279 (2003). Furthermore, a statute is viewed as a whole, and we construe its words and phrases in light of other relevant statutory provisions to give each word, clause, and sentence a reasonable meaning, if possible, to avoid rendering any part superfluous. See *In re M.M.*, 2016 IL 119932, ¶ 16.

¶ 35 In order to address C.L.'s argument, we must look at all the relevant sections of the Act beginning with the dispositional hearing. Under the Act, the trial court is directed to hold a dispositional hearing within 30 days after the court determines that a minor is abused or neglected. 705 ILCS 405/2-21(2) (West 2016). A dispositional hearing is used to "determine whether it is in the best interest of the minor and public that the minor be made a ward of the court." 705 ILCS 405/2-22(1) (West 2016). If the minor is made a ward of the court, guardianship of the child is awarded to DCFS. 705 ILCS 405/2-22(6) (West 2016). Then, the court must determine what further action should be taken in regards to the minor and may enter four types of orders: (1) continued care by the minor's parent, guardian, or legal custodian; (2) restoration of custody to the minor's parent, guardian, or legal custodian; (3) the minor's partial or complete emancipation; or (4) placement in accordance with section 2-27 of the Act. 705 ILCS 405/2-23(1) (West 2016); *In re M.M.*, 2016 IL 119932, ¶ 17.

¶ 36 Section 2-27 provides for the court, "at this hearing and at any later point," to place the minor in the custody of a suitable relative or other person, place the minor under the guardianship of a probation officer or subsidized guardianship, or commit the minor to an agency or DCFS,

> "[i]f the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardians, or legal custodian of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian." 705 ILCS 405/2-27 (West 2016).

¶ 37 Here, the trial court was correct in stating that sections 2-22 and 2-23 govern the procedure of a dispositional hearing. However, section 2-23 also plainly references and directs the court to enter placement orders, if applicable, in accordance with section 2-27. Thus, the Public Guardian and State were correct in arguing that a finding of fitness, ability, and willingness under section 2-27 is determined during the dispositional hearing. Notably, the disposition form order used by Cook County courts and entered by the court in this case is explicitly captioned "Disposition Order (Placement) 705 ILCS 405/2-27."

¶ 38 Turning to the phrase "at any later point" in section 2-27, we agree with the Public Guardian that, under the plain language of the statute, a court may rely on its initial determination during the dispositional hearing to later modify placement of the minor without once again finding the parent, guardian, or custodian unfit or unable to care for the minor. *In re Terrell L.*, 368 Ill. App. 3d 1041, 1050 (2006) (stating that "[w]e cannot conclude, based on the language of the statute, that the legislature did not intend the words 'at any later point' to actually mean 'at any later point' "). Under section 2-27, a minor may be placed with a relative or nonrelative as a legal custodian or guardian, with a probation officer or other agency, or with

a private guardian. 705 ILCS 405/2-27(1) (West 2016). The phrase "at any later point" recognizes that a minor's best interest may change during the pendency of the case and authorizes the court to modify the minor's placement without additional findings as to a parent's fitness, ability, and willingness.

¶ 39　　Next, section 2-28 outlines the court's duty to periodically review the case and order changes to the service plan and the minor's placement as needed to resolve the case and achieve permanency for the minor. The court must set a permanency goal for the parties, which in general may be return home, adoption, or private guardianship.[5] 705 ILCS 405/2-28(2) (West 2016). Custody of the minor may be returned to the parent, guardian, or legal custodian only if the "minor can be cared for at home without endangering the minor's health and safety and it is in the best interest of the minor." 705 ILCS 405/2-28(1) (West 2016). When return home is not immediately possible, time is allotted for the parties to complete services to prepare for reunification. Although, the Act directs the court to preserve family ties whenever possible, the Act also emphasizes the need to establish permanency "at the earliest opportunity." 705 ILCS 405/1-2(1) (West 2016). Our supreme court has recognized that a minor's best interest is not served if they "remain in limbo for an extended period of time." *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 40　　Thus, when return home has not been achieved and will likely not be achieved in a reasonable amount of time the Act provides for changing the permanency goal to either adoption or private guardianship. The court's only consideration in setting the permanency goal is the minor's best interest and further proceedings are initiated to finalize permanency and meet the goal. A proceeding to change a minor's placement to private guardianship is different from a proceeding seeking the termination of parental rights. See *In re April C.*, 326 Ill. App. 225, 237 (2001). Adoption requires either consent by the parents or the court's termination of the parental rights. 705 ILCS 405/2-28(2)(D) (West 2016). Private guardianship, on the other hand, requires DCFS approval, court approval, and that return home and adoption have been ruled out. 705 ILCS 405/2-27(1)(a-5), 2-28(2)(E), 2-28(4)(a) (West 2016).

¶ 41　　Termination of parental rights is governed by section 2-29 of the Act, and a trial court must find by clear and convincing evidence that the parent is unfit to care for the minor in order to terminate parental rights. 705 ILCS 405/2-29 (West 2016). This is a re-examination under a higher standard than the initial finding made during the dispositional hearing and is required when the permanency goal is set to adoption, over the parent's objection. 705 ILCS 405/2-28(2)(D), 2-29 (West 2016). However, in the case of private guardianship, the current foster parent or relative caregiver simply files a motion for appointment by the court as the private guardian. 705 ILCS 405/2-28(4)(a) (West 2016). There is no petition to terminate parental rights, and therefore there is no statutory requirement to make new findings regarding a parent's fitness. DCFS sets the requirements of eligibility for private guardianship and gives consideration to the child's best interest and the emotional bond and commitment displayed between the minor and proposed guardian. 89 Ill. Adm. Code 302.405 (2008). The court's role is to determine under the standards set forth in section 2-28, whether the goals of return home

---

[5]There are three other permanency goals provided for in the Act, but are not relevant to this case because minor is not over the age of 15, nor does he have any developmental disabilities or mental illness, and the requirements for continuing foster care as a permanency goal have not been met.

and adoption should be ruled out, and if they are, then the court only has to approve the motion for appointment.

¶ 42 Here, the trial court focused on section 2-27(1) and whether counsel could prove anew that Makiah was unable to care for C.L. The trial court erroneously focused on parental fitness in relation to changing the permanency goal or closing the case to private guardianship. As neither action would require a separate finding that Makiah was unable to care for C.L. under the Act, we agree that the court misapplied the statute and turn next to the manifest weight of the evidence.

¶ 43                                    B. Manifest Weight of the Evidence

¶ 44 C.L. argues that the goal of return home should have been ruled out because it does not serve C.L.'s best interest. C.L. contends that (1) the lengthy pendency of this case, (2) C.L.'s age and emotional and developmental needs, and (3) the improbability of Makiah making the progress necessary for reunification in the near future are factors clearly weighing against a continued goal of return home. C.L. further argues that the trial court erred because it failed to focus on C.L.'s best interest and instead indicated a focus on Makiah's rights as a parent.

¶ 45 Makiah responds that private guardianship was not an appropriate permanency goal because return home could not be ruled out as she was very close to being found fit, willing, and able to care for C.L. Furthermore, the record suggests that private guardianship would not be a proper goal because it was not in C.L.'s best interest due to the tension between Makiah and C.L.'s foster mother and her allegations of parental alienation.

¶ 46 Section 2-28 of the Act "requires the trial court to establish a permanency goal that is in the best interest of the child." *In re E.I.*, 309 Ill. App. 3d 392, 397 (1999); 705 ILCS 405/2-28 (West 2016). "When reviewing the trial court's best-interest determination, the reviewing court will not overturn the court's determination unless it is against the manifest weight of the evidence." *In re S.J.*, 364 Ill. App. 3d 432, 441 (2006). Thus, even if the court's reasoning in setting a permanency goal was flawed, it would not be overturned if it was supported by the evidence. Under section 2-28, the factors that should be considered in determining the minor's best interest include the minor's emotional, physical, and mental status or condition as well as age; the status of any of the minor's siblings; the minor's current placement and the family's intent regarding adoption; the history of services offered and availability of services still needed; and the options available for permanence. 705 ILCS 405/2-28 (West 2016).

¶ 47 As previously discussed, the court was incorrect in focusing on whether or not the State could meet the burden of proving Makiah was unfit or unable to care for child in order for it to set a permanency goal of private guardianship. In setting the permanency goal at this hearing, the Act instructs a reviewing court to consider the minor's best interest. It appears from the court's comments that it failed to give full consideration to the best interest factors outlined in section 2-28. After listening to counsel's arguments, the court issued its ruling and commented that it would not hesitate to set the goal of return home within five months had Makiah requested it. Further, the court stated that

> "I don't think I need to remind everyone that there are functioning alcoholics that take care of their children in an appropriate way throughout Chicago; and marijuana is, in my opinion, a subset of alcohol abuse; and, presumably, there are functioning users of marijuana that properly care for their children through the Chicago area."

The court made no findings on the record of C.L.'s emotional and mental state, the status of the therapy services being offered to Makiah, C.L., and Makiah and C.L. jointly, nor did the court reflect upon C.L.'s current placement and the foster family's intentions.

¶ 48 In our examination of the record, there were multiple references to C.L.'s emotional and mental state being stressed due to the continued uncertainty of his permanent placement and family. C.L. has been in the system for over five years and has lived with his foster family since he was four months old. He attends visitation with his mother four times a week in addition to individual and child-parent therapy. However, C.L. has frequently expressed an unwillingness to attend, or more specifically, a frustration with being forced to attend the visits and therapy sessions. C.L. continues to act out both verbally and physically and the testimony and report show that Makiah is unable to soothe or calm C.L. a majority of the time. As noted by Smith, C.L. will likely reach a breaking point in the near future as his irregular behaviors have continued to escalate despite continued services. Additionally, the court offered nothing on the record regarding the impact of continuing the goal of return home on C.L.'s emotional and mental state despite the serious warning in Smith's addendum and the agency's recommendation that return home was not in C.L.'s best interest.

¶ 49 In addition to the lack of progress made from the services offered to C.L., the services offered to Makiah have failed to make a substantial impact. As noted in the prepared reports, Makiah has gained some skills and knowledge from her participation in services. However, she continues to lack the ability to implement what she has learned in practice with C.L. We are not unmindful of the efforts that Makiah has made and recognize that she continues to engage in services and pursue an active role in C.L.'s life. Nevertheless, her slow progress toward reunification over the last five years, in addition to her failure to achieve return home with any of her other sons, raises serious concerns about her ability to be a full-time, single parent to C.L.

¶ 50 Furthermore, Makiah has consistently failed to complete random drug screenings even after warnings from the court regarding the importance of clean screenings on the outcome of her case. Although she has not had significant trouble engaging in therapy, attending visitation, or participating in substance abuse or psychiatric evaluations, among other assessments, she has only completed four drops in the last reporting period, three of which were positive for drugs.

¶ 51 Considering C.L.'s age, his current mental and emotional state, the drawn out time frame of this case, which continues to adversely affect C.L., in combination with the relatively stunted progress in services, we find that further attempts at achieving return home are not in C.L.'s best interest. However, neither would adoption and the related termination of Makiah's parental rights be appropriate in this case where Makiah and C.L. continue to have a relationship with one another that is a work in progress. Given the fact that C.L.'s foster parents are open to private guardianship and are willing to encourage and foster a relationship between their family and Makiah, we find that setting the case on the path toward guardianship is ideal.

¶ 52 Moreover, we find Makiah's argument that private guardianship should be ruled out as a permanency goal due to tensions between herself and foster mother unpersuasive. There is no requirement that a private guardian get along well with the minor's biological parent. A guardian is required to ensure that parents have the opportunity to visit the minor (89 Ill. Adm. Code 302.405(f)(1) (2008)), which would be best facilitated by a good relationship. Shawna's

testimony that she was willing to work on and facilitate a relationship between Makiah and C.L. is sufficient to defeat an argument disfavoring guardianship. The DCFS criteria for ordering private guardianship focus on the minor's emotional attachment to the relative or foster home caregiver; that caregiver's willingness to accept legal responsibility for the minor and commitment to providing a permanent relationship; and the length of time in, and likeliness that the minor will remain in, custody of the State (one year or more). 89 Ill. Adm. Code 302.405(c)(1) (2018). Additionally, DCFS considers the wishes of the child's prospective subsidized guardian; the wishes of the child under the age of 14 or the consent of the child, if over age 14; the interaction and interrelationship of the child with the prospective subsidized guardian; the child's adjustment to the present home, school, and community; the child's need for stability and continuity or relationship with the prospective subsidized guardian; and the mental and physical health of all individuals involved. 89 Ill. Adm. Code 302.405(d)(1) (2018). There is no indication here that the Koonces and C.L. would be unable to satisfy DCFS's requirements. Thus, private guardianship is an appropriate permanency goal and would serve C.L.'s best interest.

¶ 53                               III. CONCLUSION

¶ 54        For the reasons stated, we reverse the trial court's order setting the permanency goal of return home within 12 months and instruct the court to enter a goal of private guardianship with the Koonces.

¶ 55        Reversed and remanded with directions.