NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200258-U

NO. 4-20-0258

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 30, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|       Petitioner-Appellee, | ) | No. 17JA105 |
|       v. | ) | |
| Shyendia P., | ) | Honorable |
|       Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) This court lacks jurisdiction to review respondent's claim the trial court erred in conducting the dispositional hearing in her absence because respondent did not timely file a notice of appeal.

(2) The trial court complied with section 2-28(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2-28(2) (West 2016)) when it changed the minor's permanency goal.

¶ 2    In April 2018, the trial court entered a dispositional order finding respondent, Shyendia P., unfit to parent her minor child, J.P. (born April 8, 2017), making J.P. a ward of the court, granting custody and guardianship of J.P. to the Department of Children and Family Services (DCFS), and setting a permanency goal for J.P. of return home within 12 months. In May of 2020, the trial court entered a permanency order, pursuant to section 2-28 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-28 (West 2016)), changing the permanency goal for J.P. to private

guardianship. Respondent appeals, arguing the court violated her "statutory right[s] *** and her rights to due process under the United States Constitution" by conducting the dispositional hearing in her absence. Respondent also argues on appeal that the court failed to comply with section 2-28(2) of the Act when it changed J.P.'s permanency goal from return home within 12 months to private guardianship. We lack jurisdiction to consider respondent's first contention of error and otherwise affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4          On November 29, 2017, the State filed a petition for adjudication of wardship, alleging that J.P. was neglected under section 2-3(1)(a) of the Act (705 ILCS 405/2-3(1)(a) (West 2016)) because respondent was 15 years old, she was herself a "current ward of [the] court," and J.P. had been removed from her care "following investigation of repeated and substantial child neglect." The petition further alleged J.P. was neglected under section 2-3(1)(b) of the Act because respondent had "unresolved issues of domestic violence and/or anger management" and because the "immaturity, promiscuous and defiant behaviors, and chaotic lifestyle" of respondent and J.P.'s 14-year-old putative father, Andrew Raiz (Andrew), "render[ed] [them] unable to safely parent." After multiple hearings conducted between November 2017 and January 2018, the trial court entered an order adjudicating J.P. a neglected minor pursuant to section 2-3(1)(a) of the Act.

¶ 5          In March 2018, the Center for Youth and Family Solutions (CYFS), a private agency under contract with DCFS, filed a family service plan. In the service plan, the agency recommended J.P.'s permanency goal be set as return home within 12 months. The service plan required respondent to complete an integrated assessment interview, participate in a parenting education program, counseling, and visits with J.P., and cooperate with CYFS and DCFS. The

service plan required Andrew to complete an integrated assessment and cooperate with CYFS and DCFS.

¶ 6 On April 18, 2018, the trial court conducted the dispositional hearing. At the beginning of the hearing, the court noted that respondent was not in attendance. The assistant state's attorney and respondent's counsel informed the court that, two nights before the hearing, respondent had run away from her foster home and, the day before the hearing, was placed in a group home in Freeport, Illinois. After confirming with all interested parties that respondent's presence would not alter any of their recommendations regarding the outcome of the dispositional hearing, the court conducted the hearing in respondent's absence.

¶ 7 The trial court commenced the dispositional hearing by noting it had reviewed reports previously filed by CYFS. During argument by Andrew's counsel, Andrew admitted his unfitness to parent J.P. but indicated a desire to "take it a step at a time" to try to become a fit parent. (We note Andrew is not a party to this appeal. However, we will discuss certain facts relevant to him because of the trial court's ultimate determination to grant guardianship of J.P. to Andrew's father, Steve Raiz.) At the end of the hearing, the court found respondent and Andrew unfit to parent J.P., made J.P. a ward of the court, granted custody and guardianship of J.P. to DCFS, and set the permanency goal as return home within 12 months.

¶ 8 In June 2018, Camelot Care Centers (CCC), a private agency under contract with DCFS, became the service provider for J.P. Prior to the first permanency hearing, a caseworker from CCC and J.P.'s court appointed special advocate (CASA) both filed a permanency report. The reports indicated respondent had run away from her foster home on July 17, 2018, had stayed with a boyfriend in Decatur for two days, and was subsequently placed in her father's home in

- 3 -

Bloomington. Since that time, respondent "ha[d] been doing well with following rules and cooperating." According to the reports, respondent was attending school, intended to find employment, and had begun receiving counseling services. The reports further indicated respondent was cooperative and "appear[ed] motivated in getting her services completed in order to get [J.P.] back home." Additionally, although J.P. had been placed in a foster home that was 70 miles away from Bloomington, the reports stated respondent had attended all but four scheduled visits with J.P. and two of the four missed visits had been cancelled due to illness or miscommunication.

¶ 9         In September 2018, the trial court conducted a permanency hearing and determined, although respondent had made reasonable efforts toward returning J.P. home, she and Andrew both remained unfit to parent J.P. and the permanency goal would remain return home within 12 months.

¶ 10        In the permanency report filed in December 2018, respondent was reported to again have run away from her father's home for a period of time. The report also indicated respondent had been participating in parenting classes and counseling. In the report, it was additionally reported that Andrew lived with his father, Steve Raiz (Steve), and that Andrew had been granted visits with J.P.

¶ 11        In January 2019, the trial court conducted another permanency hearing. After hearing evidence and argument from counsel, the court expressed concern that respondent continued to run away from home and noted, although respondent and Andrew were teenagers, that fact did not "alleviate [their] responsibility as parents to [J.P.]" The court ultimately found respondent and Andrew remained unfit to parent J.P. and did not change the permanency goal.

¶ 12        Additional permanency reports were filed in March, April, and May of 2019. In those reports, it was noted respondent had been participating in parenting classes and counseling services. However, it was also reported respondent had been removed from her father's home, had moved into a foster home, had run away from that foster home for over two weeks to live with her boyfriend in Decatur, and had ultimately moved in with her grandmother in Chicago. The reports additionally stated respondent was pregnant and had missed multiple visits with J.P., which caused the number of visits she received with J.P. to be reduced from two per week to one per week. According to the reports, Andrew had also missed several visits with J.P., but he and his father both expressed a "willing[ness] to do whatever services [were] required to get [J.P.] back into their care." The reports additionally indicated that Steve was being considered as a legal guardian of J.P.

¶ 13        Following a permanency hearing in May 2019, the trial court found respondent and Andrew remained unfit to parent J.P. and changed the permanency goal to return home pending status hearing.

¶ 14        In a status report filed in June 2019, it was reported that a meeting had been conducted to determine whether CCC would place J.P. with Steve. According to the report, Steve had been convicted of domestic violence in 2002 but had completed a rehabilitative program in 2004. It was further reported Steve had been the subject of two unfounded DCFS investigations and that an additional DCFS investigation had been initiated because Andrew had run away from Steve's home and was "self-harming." Additionally, the report noted Steve's girlfriend, who supervised Andrew while Steve was at work, was on probation because she had been convicted of aggravated driving while under the influence in 2016. The report concluded, in light of this

information, Steve was not recommended as a placement for J.P.

¶ 15    On June 26, 2019, the State filed a petition to terminate parental rights. In the petition, the State alleged respondent and Andrew were unfit to parent J.P. under section 50/1(D)(b) and section 50/1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (m)(ii) (West 2018)).

¶ 16    In July 2019, additional permanency reports were filed. The reports indicated respondent had only missed two out of her last ten visits with [J.P] and, during her visits, she "exhibit[ed] appropriate parenting[.]" According to the reports, respondent had been active during her counseling sessions and parenting classes and had returned to school, but she continued to spend large amounts of time in Decatur with "the father of her unborn child." The reports also indicated Andrew had actively participated in his visits with J.P. and had completed a parenting class. The reports further stated Steve interacted with J.P. during some of Andrew's visits and encouraged Andrew to participate in counseling services. The reports also indicated the DCFS investigation involving Andrew and Steve had been determined to be unfounded and Steve's girlfriend had provided a letter from her probation officer that there were no pending violations of her probation and she was scheduled to be discharged on April 25, 2020.

¶ 17    A permanency hearing was held on August 1, 2019. At the end of the proceeding, the court continued the hearing and requested the parties and DCFS determine "what the long-term goal [was] in terms of [J.P.] and placement." The court noted J.P. had lived with the same foster family for over a year but Steve had been discussed as a potential placement. The court instructed the parties and DCFS to determine whether placing J.P. with Steve would be appropriate.

¶ 18    A CASA status report was filed on October 10, 2019. According to the report,

- 6 -

Andrew's visits with J.P. had been increased to four hours per week and Steve had also been granted visits with J.P. for one hour per week. Although the report indicated that, during J.P.'s visits with Andrew and Steve, he was "in a healthy environment with love and support," the CASA recommended Andrew be found "fit but unable" because he continued to "depend[ ] on [Steve] for financial and housing support."

¶ 19 The final service plan was filed by CCC on October 10, 2019. That service plan noted respondent was participating in all required services and she and Andrew both were making "satisfactory progress" toward completing all of the goals recommended in the plan.

¶ 20 Additional permanency reports were filed in October 2019. The reports indicated respondent had only missed two of her last ten scheduled visits with J.P. and that, during their visits, J.P. exhibited "a clear connection with his mother." According to the reports, respondent was participating in parenting classes, receiving counseling services, and attending school. The reports also indicated Andrew and Steve had participated in all scheduled visits with J.P. Additionally, the reports noted J.P. "ha[d] built a strong bond with his foster mother and the other children in the home." The reports ultimately recommended respondent and Andrew both be found fit and that "[J.P.'s] [permanency] goal be changed to return home and the agency [would] begin [ ] the reunification process with his father, [Andrew]."

¶ 21 During the October 2019 permanency hearing, respondent testified on her own behalf. According to respondent, she was seeking employment and was scheduled to graduate with a high school diploma in June 2020. Additionally, respondent testified she was attempting to participate in a "transitional living program" in which she would be taught "how to live on [her] own." According to respondent, although she "believe[d] *** [she was] able to take care of [J.P.]"

at that moment, she further testified that, by the time she graduated high school, she would be "fit and able to take care of [J.P.]" After respondent testified, counsel presented argument. The State requested that respondent and Andrew continue to be found unfit. The guardian *ad litem* (GAL) asked the court to find respondent and Andrew "fit but unable" and, along with the State, requested the court appoint Steve as J.P.'s guardian. Respondent's counsel requested that respondent be found fit to care for J.P. The court ultimately concluded that J.P. should remain a ward of the court, DCFS should continue acting as guardian, and the permanency goal should be changed to return home within 12 months. Although the court commented respondent and Andrew had made "remarkable progress," it found that the two were still unable to parent J.P. "in large part given their age and their circumstances." However, the court also ordered that respondent and Andrew receive increased visitation with J.P. to "assess their ability to meet [J.P.'s] needs on a day to day basis[.]" The court concluded that, at the next permanency hearing, it would "look at how visitations go" and, if there were any new problems, it would "have to [consider] guardianship because of the [parents'] inability."

¶ 22      In December 2019, additional permanency reports were filed. According to the reports, respondent and Andrew were both receiving additional visits, including unsupervised, overnight visits, and those visits had "gone well." The reports further stated Andrew, J.P., and Steve were "developing a loving, supportive, and caring bond." The reports also indicated that respondent had stopped attending school and counseling, that she had recently given birth, and that respondent declined to accept a placement in a transitional living program, choosing instead to continue living with her grandmother in Chicago. The reports recommended respondent and Andrew both be found "fit but unable" to care for J.P., that J.P. should remain in his current foster

placement, and the permanency goal should be changed to return home in five months.

¶ 23    In January 2020, the trial court conducted a brief permanency hearing. The court entered a stipulated order, determining respondent and Andrew remained "fit but unable," DCFS should remain the guardian of J.P., and the permanency goal should remain return home within 12 months.

¶ 24    The final permanency reports and status reports were filed in March and May 2020. According to the reports, J.P. had been placed with Andrew in January 2020 and respondent received unsupervised, overnight visits with J.P. every other weekend. The reports also indicated, although respondent was not attending school, she was participating in counseling services and parenting education courses. Additionally, the reports indicated that, in a separate probate proceeding, Steve had petitioned the trial court for an unsubsidized guardianship, which the reports recommended be granted.

¶ 25    On May 7, 2020, the trial court granted Steve's guardianship petition in the probate proceeding. Also on that date, the trial court conducted a permanency hearing in the juvenile abuse case. After hearing argument from the parties and the GAL, the court determined that "[g]iven the [c]ourt's decision in [the guardianship case] *** and given the information in the report," respondent and Andrew remained fit but unable to parent J.P. Although the court found respondent and Andrew had "made reasonable efforts and reasonable progress with respect to what the permanency goal was," the court determined, in light of the fact Steve had been appointed as guardian of J.P., it should discharge DCFS as guardian of J.P., terminate wardship, and close the juvenile abuse case. The court concluded, "I think permanency has been achieved today in the nature of the guardianship."

¶ 26        In the court's final written permanency order, the court noted, in making its decision, it had considered the service plan, the final status report, and stipulation of the parties as well as "all admitted evidence, statutory factors, the appropriateness of the permanency goal, whether the recommended services ha[d] been provided, whether reasonable efforts ha[d] been made by all parties to achieve the goal, whether the plan ha[d] been successful, and whether the goal ha[d] been achieved." The order noted respondent and Andrew "made reasonable and substantial progress toward returning [J.P.] home," made "reasonable efforts toward returning [J.P.] home," and were fit but unable to care for J.P. The order listed J.P.'s permanency goal as "Private/Subsidized guardianship" and stated alternate goals had been ruled out because of the "age and needs of the minor[ ]" and because "[Steve] filed for and was granted guardianship of the minor[.]" The written order also indicated DCFS had "made reasonable efforts," the services listed in the service plan were "[a]ppropriate and reasonably calculated to facilitate the achievement of the permanency goal," and the services listed in the plan had been provided. According to the written order, the permanency goal "[had] been achieved," placement with Steve was "in the best interest of [J.P.]," and J.P. could be cared for in Steve's home "without endangering [his] health, welfare and safety[.]" The order concluded that Steve's home was "a stable, permanent placement[.]"

¶ 27        This appeal followed.

¶ 28                              II. ANALYSIS

¶ 29        On appeal, respondent argues the trial court violated her "statutory right[s] *** and her rights to due process under the United States Constitution" by conducting the dispositional hearing in her absence. Respondent also argues the court failed to comply with section 2-28(2) of

- 10 -

the Act when it changed J.P.'s permanency goal from return home within 12 months to private guardianship.

¶ 30        A. This Court Lacks Jurisdiction to Review the Dispositional Order.

¶ 31        Respondent argues the trial court's decision to conduct the dispositional hearing in her absence violated her "statutory right[s] *** and her rights to due process under the United States Constitution." The State responds that we lack jurisdiction to review the respondent's claim because the respondent failed to appeal the court's dispositional order within 30 days of entry of the order. We agree with the State.

¶ 32        In all proceedings under the Act other than delinquent minor proceedings, "appeals from final judgments [are] governed by the rules applicable to civil cases." Ill. S. Ct. R. 660(a), (b) (eff. Oct. 1, 2001). Illinois Supreme Court Rule 303(a)(1) (eff. July 1, 2017) requires that, in all civil cases, a notice of appeal "must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from ***." "Dispositional orders from juvenile court are generally final and appealable." *In re D.D.*, 212 Ill. 2d 410, 418, 819 N.E.2d 300, 304 (2004). Compliance with Rule 303(a)(1) is "mandatory and jurisdictional." (Internal quotation marks omitted.) *In re C.S., Jr.*, 294 Ill. App. 3d 780, 787, 691 N.E.2d 161, 165 (1998). Accordingly, where an appellee fails to file an appeal within 30 days after entry of a dispositional order, this court "ha[s] no jurisdiction to go back and reconsider whether [the order] was proper when made." *In re Leona W.*, 228 Ill. 2d 439, 457, 888 N.E.2d 72, 81-82 (2008).

¶ 33        In the present case, the dispositional hearing conducted by the trial court in respondent's absence was held on April 18, 2018, and the court entered its dispositional order the same day. Respondent did not file her notice of appeal until June 5, 2020, well beyond the 30 days

by which, under Rule 303(a)(1), a notice of appeal challenging the dispositional order could be filed. Thus, we lack jurisdiction to review the respondent's claim that the trial court erred in conducting the dispositional hearing in her absence. See *C.S., Jr.*, 294 Ill. App. 3d at 787.

¶ 34          B. The Trial Court Complied With Section 2-28(2) of the Act

¶ 35          Respondent next argues the trial court failed to comply with section 2-28(2) of the Act when it changed J.P.'s permanency goal from return home within 12 months to private guardianship. Specifically, respondent argues, in changing the permanency goal, the court failed to consider "the appropriateness of the services provided, the parties' efforts to achieve the goal, and the extent to which the goal ha[d] been achieved." Respondent further argues the court "failed to rule out the [other potential permanency goals], failed to explain the permanency goal it set, and failed to consider all of the factors to determine [J.P.'s] best interest."

¶ 36          Respondent requests that we review her claim under the manifest weight of the evidence standard. However, we note that, on appeal, respondent does not challenge the court's decision to change J.P.'s permanency goal based on the evidence presented but instead argues the "court failed to comply with section 2-28 of the [Act]." "Whether the trial court complied with section 2-28 of the [Act] is a matter of statutory construction. Thus, our review is *de novo*." *In re T.S.*, 402 Ill. App. 3d 1159, 1169, 932 N.E.2d 1103, 1111 (2010).

¶ 37          Section 2-28 of the Act sets forth the procedure by which the trial court determines the future status of abused, neglected, or dependent minors through a series of permanency hearings. See 705 ILCS 405/2-28 (West 2016). "At the permanency hearing, the court *** determine[s] the future status of the child" by setting one of the "permanency goals" listed in section 2-28(2). *Id.* The relevant statutory permanency goals are:

"(A) The minor will be returned home by a specific date within 5 months.

(B) The minor will be in short-term care with a continued goal to return home within a period not to exceed one year ***.

(B-1) The minor will be in short-term care with a continued goal to return home pending a status hearing. ***

(C) The minor will be in substitute care pending court determination on termination of parental rights.

(D) Adoption ***.

(E) The guardianship of the minor will be transferred to an individual or couple on a permanent basis provided that goals (A) through (D) have been ruled out." *Id.*

¶ 38 Section 2-28(2) of the Act requires that the permanency goal set by the trial court be selected based on the best interest of the child considering: (1) the "[a]ge of the child," (2) the "[o]ptions available for permanence," (3) the "[c]urrent placement of the child and the intent of the family regarding adoption," (4) the "[e]motional, physical, and mental status or condition of the child," (5) the "[t]ypes of services previously offered and whether or not the services were successful and, if not successful, the reasons the services failed," (6) the "[a]vailability of services currently needed and whether the services exist," and (7) the "[s]tatus of siblings of the minor." *Id.* The court is also required to consider:

"(i) the permanency goal contained in the service plan, (ii) the appropriateness of the services contained in the plan and whether those services have been provided, (iii) whether reasonable efforts have been made by all the parties to the service plan to achieve the goal, and (iv) whether the plan and goal have been achieved." *Id.*

- 13 -

¶ 39　　　　In the present case, respondent first argues that, in changing the permanency goal to private guardianship under section 2-28(2)(E) of the Act, the trial court "failed to rule out the preceding permanency goals [and] failed to explain the permanency goal it set ***." Respondent correctly notes that section 2-28(2) provides that, "[i]n selecting any permanency goal, the court shall indicate in writing the reasons the goal was selected and why the preceding goals were ruled out." *Id.* However, this court may relax the writing requirement when "something exists in the record stating the basis for the court's determination ***." *In re S.E.*, 319 Ill. App. 3d 937, 945, 746 N.E.2d 323, 330 (2001). Accordingly, we may review the entirety of the record to determine whether the court explained why it selected private guardianship and why it ruled out the alternative permanency goals.

¶ 40　　　　Here, the record demonstrates the trial court adequately explained its decision to change the permanency goal to private guardianship instead of selecting an alternative permanency goal. In its written order, the court stated guardianship had been selected instead of another permanency goal because it was necessary considering the "age and needs of [J.P.]" and because Steve had previously been granted guardianship of J.P. In its oral pronouncement, the court elaborated by noting respondent and Andrew were fit but unable to parent J.P. and "permanency [had] been achieved *** in the nature of the guardianship." Together, these findings explain the court's reasoning for selecting guardianship and ruling out the other possible permanency goals. These findings demonstrate the court ruled out the first three potential permanency goals because, by changing the goal to private guardianship, the court achieved permanency for J.P. immediately in the same home as his biological father rather than continuing J.P. as a ward of the court in the custody of DCFS while months or even years went by while Andrew and respondent attempted to

demonstrate their ability to independently care for J.P. See *In re S.J.*, 368 Ill. App. 3d 749, 758, 859 N.E.2d 281, 289 (2006) (quoting 705 ILCS 405/1-2 (West 2004)) ("The 'purpose and policy' section of the Juvenile Court Act states that a goal of the Act is to achieve permanency at the 'earliest opportunity' for the subject children."). The court ruled out the other two potential permanency goals, substitute care pending termination of parental rights and adoption, by finding Andrew and respondent fit to parent J.P. See *In re C.L.*, 2018 IL App (1st) 180577, ¶ 41 122 N.E.3d 401 (citing 705 ILCS 405/2-29 (West 2016)) ("Termination of parental rights is governed by section 2-29 of the Act, and the trial court must find by clear and convincing evidence that the parent is unfit to care for the minor in order to terminate parental rights.").

¶ 41     Respondent also argues the trial court failed to consider "the appropriateness of the services provided, the parties' efforts to achieve the goal, *** the extent to which the goal ha[d] been achieved," and "all of the factors to determine [J.P.'s] best interest." This argument is belied by the record.

¶ 42     In the final written permanency order the trial court explicitly found: (1) "[t]he services contained in the service plan [were] [a]ppropriate and reasonably calculated to facilitate the achievement of the permanency goal," (2) respondent and Andrew had "made reasonable efforts toward" completing the prior permanency goal of returning J.P. home within 12 months, and (3) the new permanency goal, private guardianship, "ha[d] been achieved." Additionally, in the court's order, the court indicated it had "considered *** all admitted evidence, statutory factors, the appropriateness of the permanency goal, whether the recommended services ha[d] been provided, whether reasonable efforts ha[d] been made by all parties to achieve the goal, whether the plan ha[d] been successful, and whether the goal ha[d] been achieved." Accordingly, we find

the court complied with section 2-28(2).

¶ 43                                    III. CONCLUSION

¶ 44          For the reasons stated, we affirm the trial court's judgment.

¶ 45          Affirmed.