NOTICE
Decision filed 01/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250638-U

NO. 5-25-0638

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* LUCAS S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 25-JA-14 |
| | ) | |
| Timothy S., | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice Cates and Justice Bollinger concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The dispositional order of the circuit court of Vermilion County that adjudicated the minor to be neglected and made him a ward of the court was not against the manifest weight of the evidence.

¶ 2   Following a dispositional hearing, the court adjudicated Lucas S. a ward of the court and appointed the Department of Children and Family Services (DCFS) as his guardian. Timothy S., the respondent and adoptive father of Lucas, appeals, arguing that the circuit court erred by adjudicating Lucas neglected. We disagree and affirm.

1

¶ 3                          I. BACKGROUND

¶ 4     On February 11, 2025, the State filed a petition for adjudication of wardship for Lucas S., the grandson and adopted child of the respondent, Timothy S.[1] The petition alleged that Lucas, born November 2016, was neglected in that his environment was injurious to his welfare due to Timothy's untreated mental health issues. 705 ILCS 405/2-3(1)(b) (West 2024). The matter proceeded to a shelter care hearing on February 13, 2025. During the hearing, Kyla Chantos, an investigator for DCFS, testified regarding the findings of her investigation into a hotline report about Timothy.

¶ 5     Chantos testified that on February 10, 2025, a hotline report alleged that Timothy was smoking "crack cocaine," had active hallucinations, and his home was uninhabitable due to dog feces throughout the home. Chantos spoke to Timothy at his home about the hallucinations. Timothy stated that an individual named Gary Brown was breaking into his home, so he had to screw all the windows of the home closed, and that Brown hid in the walls of the home. During a later interview, Lucas told Chantos that Brown hides under his bed and reaches up to grab his legs at night to wake him up. Lucas said that Brown knocked a mirror off the wall and broke it from inside the walls, so Timothy grabbed a sword and attempted to catch Brown to kill him.

¶ 6     Chantos said that Timothy had previous interactions with DCFS, including January 2024, but the records were expunged and not available to DCFS. Chantos testified that Lucas started living with Timothy's prior partner, Patricia Sidwell, in May 2024 due to a house fire and subsequent home renovations. Lucas stayed with Patricia during the week and with Timothy on the weekends. After the February 10, 2025, hotline phone call, DCFS created a safety plan that

---

[1]An amended petition was filed on March 3, 2025, which corrected the parent and guardian information to remove Lucas's birth parents' information and only include Timothy S.

included a requirement that he continue to reside with Patricia, and she was to supervise any visits with Timothy and Lucas.

¶ 7    Chantos testified that she believed that Timothy's mental health issues were so significant that he was unable to care for Lucas. Chantos attempted to speak to Timothy about any medications he was taking, but he did not provide her with any information. She discovered through Aunt Martha's, a health care provider, that Timothy was prescribed medication for hallucinations, but she was unaware of what they were.

¶ 8    On cross-examination, Chantos testified that Brown was a real individual who previously had a relationship with Timothy's sister and is the father of her children. Chantos requested prior police reports about Brown but had not received them.

¶ 9    At the conclusion of Chantos's testimony, the State argued that Timothy's mental health issues were affecting Lucas, and that unsupervised visits with Timothy were unsafe for Lucas. The State said, "Mr. Brown may be a real person, but I doubt he's in the home doing these things to [Timothy]. These are causing Lucas *** to have real issues in his life." The State requested that temporary custody be entered and guardianship be placed with DCFS.

¶ 10    Timothy's counsel acknowledged that Timothy's house was not in any condition for Lucas to live there permanently, but he argued that Lucas could continue to live with Patricia. Further, he argued that based on the issues he had with Brown in the past, Brown may have actually been present in his home. He asked the court to find that there was no immediate and urgent necessity to take shelter care of Lucas.

¶ 11    The circuit court entered an order, finding, "There is an immediate and urgent necessity to remove the child from the home and leaving the child in the home is contrary to his health, welfare and safety ***." The court then placed temporary custody of Lucas with the Guardianship

3

Administrator of DCFS. The court then explained to Timothy that he will need to complete any services deemed necessary by DCFS and cooperate with them in order to progress in the case. Timothy completed a drug screen the same day, which tested positive for cocaine and was verified by a retest on February 20, 2025.

¶ 12    An adjudicatory hearing took place on May 29, 2025. The State called Chantos to testify. She again stated the information from the shelter care hearing, described above. Chantos said that during her visit to the home, it was in an unsafe condition, and Timothy was "heightened, and agitated, and very non-cooperative." Timothy told Chantos of Brown living in his walls, but she did not observe anyone else in the home while she was there. Chantos testified that a previous DCFS report showed that Timothy was prescribed medication, but he said he does not always take it because he does not like the way it makes him feel. The medication was prescribed to help him with the hallucinations and delusions. Timothy refused to cooperate with a drug screen or show his medications to Chantos.

¶ 13    On cross-examination by Timothy's counsel, Chantos stated that a previous report to DCFS stated that Timothy used a sword to destroy furniture in the home with Lucas present. The report in February indicated that there was dog feces in the home, destroyed furniture, and that Timothy was using cocaine and exhibited erratic behavior. At the time the case began, Lucas was living with Patricia during the week and with Timothy on the weekends, and Lucas appeared to be healthy with normal development for his age.

¶ 14    As to Timothy's mental health issues, Chantos testified that she contacted his mental health provider, and they informed her that he was last seen in September 2024 and was scheduled for an appointment on February 17, 2025. Timothy later told his provider he was "[properly] participating in his own medication therapy."

4

¶ 15　On cross-examination from the guardian *ad litem* (GAL), Chantos stated that her concern with Timothy's mental health was that he was seeing and hearing things that no one else could, and that he could harm Lucas by swinging a sword around the home. However, Timothy did not submit to a drug screening on the day of the visit and did not discuss his medications with Chantos either. He did indicate that he saw a psychiatrist and had sessions.

¶ 16　On examination from the court, Chantos stated that she mentioned her concerns about Timothy's hallucinations and delusions to his mental health team. His team stated that he reports taking his medication as prescribed, but the team also inferred that the hallucinations were a sign or symptom indicating that he was not taking his medication as prescribed. Further, the team did not have access to the most recent laboratory results, which would indicate the amount of the medication in his system.

¶ 17　Timothy then testified on his own behalf. He stated that he had adopted Lucas two or three years earlier, but that Lucas had lived with Timothy his entire life. Timothy said that Lucas began living with Patricia in March 2024 after Timothy had emergency surgery, and around the same time as Timothy's house fire. Timothy described his mental health issues and said he was working with his psychiatrist for treatment and medication. When questioned about drug use, Timothy stated that he previously had drug use problems but stopped. He confirmed that he refused to do a drug screen without a court order. Timothy claimed "[i]t was none of their business what I did in my private life."

¶ 18　Timothy testified that Brown was his sister's ex-boyfriend, and the two did not have a good relationship. Timothy stated that his neighbors saw Brown exit his house but did not want to get involved. Further, police believed Timothy to be hallucinating when he called to report the issue. Timothy said that he had adequate food for Lucas when he stayed, and that he got rid of the dogs

after DCFS visited. He did not deny that the home had dog feces in it due to Timothy's inability to care for the dogs. Timothy testified that he had a surveillance camera in his front room and his kitchen, which detected people in his home, but he cannot access the data anymore because someone hacked his phone and took control of the phone and the cameras.

¶ 19    On cross-examination from the State, Timothy stated that he takes his medication to control the hallucinations he experienced, and the medication had been adjusted over time to fit his needs. Timothy denied destroying any furniture with a sword and said that items were destroyed in the house fire. He said that Brown was not living in the walls of his home and that if he had previously told somebody he was, then that would not have been a rational statement.

¶ 20    At the conclusion of the evidence, the State asked the circuit court to find Lucas neglected. The State argued that while Timothy testified to the court that the home was fine now that his medication was adjusted, protective custody was previously necessary due to an injurious environment from his mental health issues. Timothy's history showed that if he did not like the way his medication made him feel, he would stop taking it, and doing so would result in unsanitary and unsafe conditions for Lucas. Due to Timothy's failure to comply with mental health treatment, the State argued that Lucas was in an injurious environment and thus neglected.

¶ 21    Timothy's counsel argued that Lucas was not neglected, and that the initial report did not reflect the current conditions of the home. Timothy corrected the issues with his medication, continued medical treatment from his psychiatrist, and the home was now safe. Because Timothy cared for Lucas and he had no injuries or other indications of being neglected, the petition should be denied.

¶ 22    The GAL requested that the circuit court grant the petition, stating that Timothy's mental health issues had a significant impact on his ability to properly care for Lucas. Lucas was able to

directly report the nature of Timothy's hallucinations, indicating that he was exposed to and impacted by the mental health issues.

¶ 23    The circuit court stated that it considered all the testimony presented, specifically that Timothy decided to transfer guardianship to Patricia after his physical ailments and a house fire, showing a "responsible and loving act." However, when Lucas was taken into protective custody, Timothy did not believe his medication was effective, so he made the decision to stop his medication and as a result, the house became unsafe. The court also noted that Timothy's lab results showed he tested positive for cocaine in February 2025. The court found that at the time protective custody was taken, Lucas's environment was injurious to his welfare due to Timothy's mental health issues. Lucas's placement outside the home remained appropriate and the State proved the allegations of the petition by a preponderance of the evidence. The court also explained to Timothy what would be considered at the next dispositional hearing, including his progress of services and what needed to happen for reunification.

¶ 24    On July 28, 2025, the Center for Youth and Family Solutions (CYFS) filed a dispositional report. The report detailed the events leading up to DCFS's case, and Timothy's integrated assessment from DCFS was attached. The integrated assessment was completed based on the information in the case record, as Timothy did not respond to the caseworker for an interview.

¶ 25    The dispositional report stated that despite reports of drug use at the beginning of the case, Timothy believes that only the condition of the home was the cause to remove Lucas from his care, and once the home was fixed, custody should be restored. Timothy corrected the issues with the home, completed a parenting assessment, and attended parenting classes despite a low risk on the assessment. The report stated that Timothy was referred to New Directions in April 2025 for a substance abuse assessment. Despite multiple reminders and rescheduling, Timothy never

7

appeared for the assessment. Timothy also did not complete any drug screenings, despite additional efforts from CYFS to accommodate him.

¶ 26 Timothy reported having a history of hallucinations, bipolar disorder, and manic depression; however, an increase in his medication helped him tremendously. He stated he saw a psychiatrist, but at the time of the report, CYFS did not have access to his medical records.

¶ 27 The report stated that Timothy was unfit and unable to care for Lucas, and that Timothy should complete the following services: cooperation with CYFS, attend parenting classes, continue psychiatric treatment and medication, complete random toxicology screenings, and undergo a substance abuse assessment. CYFS recommended continued supervised visits with Lucas.

¶ 28 CYFS filed an amended dispositional report on August 1, 2025. The updated report included information from Timothy's medical records from Aunt Martha's. Timothy's medical records showed diagnoses of generalized anxiety disorder, depressive disorder, and bipolar disorder. He was on medication for his mental health and appeared to be taking it regularly.

¶ 29 The amended report also included an added recommendation for anger management. The report stated that before the July 31, 2025, hearing, witnesses saw Timothy talking to Patricia in a hostile manner. Law enforcement later escorted Patricia to her car after the hearing, and Timothy appeared to follow her. When officers questioned him, he became immediately agitated, cursed, and yelled at the officers. Due to Timothy's actions with the officer, CYFS recommended anger management as part of his service plan.

¶ 30 The matter proceeded to the dispositional hearing on August 6, 2025. The State, Timothy, and the GAL all stipulated to the August 1, 2025, report and presented no further evidence. The State argued that, while Timothy made some efforts to address the conditions that led to Lucas's removal, he still required additional services. The State argued that Timothy remained unfit and

unable to adequately parent Lucas, and as such, that Lucas should be adjudicated neglected and made a ward of the court, with guardianship awarded to DCFS while Timothy completes the necessary services.

¶ 31    Timothy's counsel argued that Lucas should be returned home as soon as possible and that services for Timothy be made available even after Lucas had been returned home. While Timothy had a "very strong personality" and a positive drug test, he still showed that he is in a position to care for Lucas and corrected the issues with the home.

¶ 32    The GAL argued that due to the outstanding services for substance abuse issues, Timothy should be found unfit and unable to care for Lucas. However, the goal should be set for Lucas to return home.

¶ 33    The circuit court found that Timothy was unfit and unable to care for Lucas, and it was in the best interest of Lucas's health, welfare, and safety to be made a ward of the court. The court stated that Timothy needed to engage in the services outlined in the report in order for Lucas to be returned home. Timothy timely appealed on August 6, 2025.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, Timothy challenges the circuit court's dispositional order finding Lucas to be neglected and making him a ward of the court. He does not, however, argue any error at the dispositional hearing itself.

¶ 36    The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). Upon the filing of a petition for wardship by the State, the Act provides that a temporary custody hearing shall be held during which the court shall determine whether there is probable cause to believe that the

child is neglected, whether there is an immediate and urgent necessity to remove the child from the home, and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal. 705 ILCS 405/2-10 (West 2024).

¶ 37    Following placement of a child in temporary custody, the circuit court must make a finding of abuse, neglect, or dependence before it conducts an adjudication of wardship. *Id.* § 2-21; *In re N.B.*, 191 Ill. 2d 338, 343 (2000). Section 2-3(1)(b) of the Act defines a "neglected minor" to include "any minor under 18 years of age *** whose environment is injurious to the minor's welfare." 705 ILCS 405/2-3(1)(b) (West 2024). In general, the term "injurious environment" has been interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." *In re N.B.*, 191 Ill. 2d at 346 (quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)). Accordingly, cases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *In re Arthur H.*, 212 Ill. 2d at 463.

¶ 38    At a proceeding for adjudication of wardship, the State must prove the allegations of neglect by a preponderance of the evidence. *Id.* at 463-64. In other words, the State must establish that the allegations of neglect are more probably true than not. *Id.* at 464. The circuit court's findings regarding wardship and fitness at the dispositional hearing stage are given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991). Because a circuit court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the circuit court's findings merely because the reviewing court may have reached a different decision. *In re Lakita B.*, 297 Ill. App. 3d 985, 994

10

(1998). A circuit court's determination of wardship or fitness will be reversed "only if the factual findings are against the manifest weight of the evidence." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 39 On appeal, Timothy argues that the circuit court erred in finding Lucas to be neglected and making him a ward of the court. Timothy specifically argues that the State failed to prove Lucas was neglected because the home was restored to safe conditions, Timothy arranged for Lucas to stay with Patricia while the house was being repaired, and Timothy regularly saw his doctor and took his medication. Further, while the report stated that Timothy hallucinated Brown, he was a real person, and witnesses reportedly saw Brown running from Timothy's home.

¶ 40 The legislature has stated that the purpose of an adjudicatory hearing is "to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence." 705 ILCS 405/1-3(1) (West 2024); *In re Arthur H.*, 212 Ill. 2d at 465. During the adjudicatory hearing, the court hears evidence on the State's petition for adjudication to determine if the minor is abused, neglected, or dependent based on that evidence. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 23.

¶ 41 In the present case, the State's petition alleged that Lucas was neglected due to Timothy's untreated mental health issues. The purpose of the adjudicatory hearing was then for the State to prove the elements of that petition that Timothy's mental health caused an injurious environment to Lucas. The petition was filed on February 11, 2025, and after several continuances, the adjudicatory hearing was held on May 29, 2025. While the hearing was a few months later, the issue at the hearing was whether Lucas was neglected at the time the petition was *filed*, not at the time of the hearing. The circuit court even stated:

11

"So when the Court focuses on the period of the shelter care time, protective custody being taken, the Court finds that the State has met its burden and has established by a preponderance of the evidence that the minor child's environment is injurious to his welfare due to [Timothy's] mental health issues."

As such, we will review the court's decision that the State proved the petition's elements from the time it was filed.

¶ 42    In cases like the present, it is not enough to show that a parent suffers from a mental illness, but rather, the State must show that the mental illness places the child in an injurious environment. *In re Faith B.*, 216 Ill. 2d 1, 8 (2005). During the adjudicatory hearing, the State presented evidence that due to Timothy's mental health issues, he suffered from hallucinations, failed to keep his house safe and sanitary, exposed Lucas to dangerous conditions in the home, and reportedly wielded a weapon around Lucas. While the home had been repaired by the time of the adjudicatory hearing, the hearing focused on the conditions at the time the petition was filed. Moreover, the condition of the home was not the only reason Lucas was removed from Timothy's care. The circuit court stated, "The Court agrees that the condition of the house is not a direct symptom, but a manifestation of the mental health issue." In addition to the safety of the home, Lucas was familiar with Timothy's hallucinations and reported that Timothy told him Brown hid under his bed and reached up to grab his legs at night to wake him up, demonstrating that Timothy's mental illness affected Lucas in more than just the home environment. Based on these facts, the State showed that Timothy's mental illness placed Lucas in an injurious environment due to the safety and sanitariness of the home.

¶ 43    If the circuit court determines that the minor is abused, neglected, or dependent, then the matter proceeds to a dispositional hearing at which it determines whether it is consistent with the

health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2024). "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather, "a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *Id.* "Though the court, when making the wardship determination, considers the specific parent's capability to care for the child, *** the wardship determination is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life." *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15. A trial court's dispositional decision regarding a minor rests within its discretion and will not be overturned unless it is against the manifest weight of the evidence. *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009).

¶ 44    While Timothy's brief states that the circuit court erred in making Lucas a ward of the court and the dispositional order should be vacated, he does not raise any issues from the dispositional hearing or about the stipulated dispositional report. Given that Timothy stipulated to the report during the hearing, presented no further evidence, and made no specific arguments on appeal, Timothy is asking this court to review the same evidence the circuit court had to consider and reach a different result. Based on our review of the record and the evidence presented, including the dispositional report, an opposite conclusion than that of the circuit court is not clearly apparent. Therefore, we will not substitute our judgment for that of the circuit court.

13

¶ 45        III. CONCLUSION

¶ 46 For the foregoing reasons, we affirm the August 6, 2025, dispositional order of the Vermilion County circuit court.

¶ 47 Affirmed.